Opinion for the Court filed by Senior Circuit Judge EDWARDS.
Opinion filed by Circuit Judge BROWN dissenting in part.
EDWARDS, Senior Circuit Judge:
The Great Lakes Pilotage Act (“GLPA”) sets forth certain requirements for persons who serve as pilots of vessels sailing on the waters of the Great Lakes. Under the statute, the United States Coast Guard (“Coast Guard” or “agency”) is afforded discretion to “authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.” 46 U.S.C. § 9304(a). Pursuant to this statutory authority, the Coast Guard has promulgated regulations that provide for the formation of pools in three Great Lakes districts. 46 C.F.R. § 401.300. Under the applicable regulations, “[w]hen pilotage service is not provided by the association authorized under 46 U.S.C. 9304 because of a physical or economic inability to do so, ... the Director [of Great Lakes Pilotage of the Coast Guard] may order any U.S. registered pilot to provide pilotage service.” Id. § 401.720(b).
Appellant Richard Menkes was a member of the St. Lawrence Seaway Pilots’ Association (“SLSPA” or “Association”)— the only voluntary association designated by the Coast Guard to provide pilotage service in the district encompassing the St. Lawrence River and Lake Ontario. Menkes resigned from the SLSPA in 2000 and then requested the Coast Guard to dispatch him as an unaffiliated, independent pilot on the St. Lawrence River. In March 2001, Menkes was so assigned pur *322 suant to § 401.720(b). In late 2003, the Coast Guard determined that Menkes’s appointment as an independent pilot would “naturally expire” at the conclusion of the 2003 navigation season. The agency indicated that it would continue to monitor the SLSPA to determine whether the services of an independent pilot would be required during the 2004 season. However, Menkes was never reassigned to serve on the St. Lawrence River in 2004.
In August 2004, Menkes filed suit against the United States Department of Homeland Security, the Coast Guard, and the Assistant Commandant of the Coast Guard (collectively “the Government”), challenging the Coast Guard’s determination to terminate his appointment as an unaffiliated, independent pilot. Menkes claimed that the Government’s action violated the Administrative Procedure Act (“APA”), as well as his First Amendment and Fifth Amendment rights. The District Court granted the Government’s motion to dismiss. Menkes v. Dep’t of Homeland Sec. (“Menkes I ”), 402 F.Supp.2d 204 (D.D.C.2005). On appeal, we reversed and remanded the case. Menkes v. Dep’t of Homeland Sec. (“Menkes II”), 486 F.3d 1307 (D.C.Cir.2007). The District Court then remanded the case to the Coast Guard for further consideration.
After further review, the Coast Guard held that, under the statute and applicable regulations, a “voluntary association” under 46 U.S.C. § 9304 refers to a group of people “joined together for a certain purpose, and not a legal entity distinct from the persons who are members.” See Agency Decision on Remand in the Appendix to this opinion. The Coast Guard held further that a certified voluntary association is not required to “dispatch every registered, licensed and qualified pilot who desires to provide pilotage services.” Id. In other words, pilots who are not members of a designated voluntary association do not share in its responsibilities or privileges. The Coast Guard also determined that Menkes had no right to serve as an independent pilot during the 2004 navigation season, because, as of December 2003, the SLSPA appeared to have a sufficient number of pilots to provide pilotage service for the upcoming season.
Menkes again sought relief in the District Court. After reviewing cross-motions for summary judgment, the District Court rejected Menkes’s claims and granted judgment to the Government. Menkes v. Dep’t of Homeland Sec. (“Menkes III”), 662 F.Supp.2d 62 (D.D.C.2009). On Menkes’s APA claim, the District Court held that the Coast Guard reasonably concluded that Menkes’s term of service as an independent pilot expired in 2003, and that Menkes had no entitlement to reassignment in 2004. The District Court also held that issue preclusion barred Menkes’s First Amendment claim because the Second Circuit had ruled against Menkes on the same issue in a suit against the SLSPA. Menkes v. SLSPA (“SLSPA”), 269 Fed-Appx. 54 (2d Cir.2008). Finally, the District Court rejected Menkes’s Fifth Amendment due process claim because he failed to demonstrate a viable property interest in an appointment to serve as a pilot in a specific area. Menkes timely appealed.
We affirm the judgment of the District Court. First, we hold that the Coast Guard’s interpretation of the term “voluntary association” in 46 U.S.C. § 9304 easily survives review under Chevron Step Two. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that, once a court determines that Congress either explicitly or implicitly delegated to an agency the authority to fill a gap in its authorizing statute, the court must accept the agency’s position if it is *323 based on a “permissible” interpretation of the statute). Second, we agree with the District Court that Menkes’s First Amendment claim appears to be precluded by the Second Circuit’s judgment. In any event, the claim fails on the merits. Third, we hold that the Coast Guard did not act arbitrarily and capriciously in determining that Menkes’s dispatch as an independent pilot expired after the 2003 navigation season. Fourth, we reject Menkes’s Fifth Amendment due process claim, because Menkes had no constitutionally protected entitlement to continued dispatch by the Coast Guard. Finally, we hold that the District Court did not abuse its discretion in denying Menkes’s request for extra-record discovery.
I. Background
A. Statutory and Regulatory Background
In 1960, Congress passed the GLPA in order “to establish pilotage requirements for oceangoing vessels in their navigation of U.S. waters of the Great Lakes and St. Lawrence River and to provide a basis for a regulated pilotage system to meet those requirements.” H.R.Rep. No. 86-1666, at 1 (1960), reprinted in 1960 U.S.C.C.A.N. 2481, 2481. The statute, as amended, requires both U.S. and foreign vessels in these waters to “engage a United States or Canadian registered pilot for the route being navigated,” 46 U.S.C. § 9302, and requires the Coast Guard to prescribe “standards of competency” that each applicant must meet in order to become a United States registered pilot, id. § 9303. Most pertinent to this appeal, it provides that:
(a) The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.
(b) For pilotage pools, the Secretary may—
(1) limit the number of the pools;
(2) prescribe regulations for their operation and administration;
(3) prescribe a uniform system of accounts;
(4) perform audits and inspections; and
(5) require coordination on a reciprocal basis with similar pool arrangements authorized by the appropriate agency of Canada.
Id. § 9304.
The Coast Guard has promulgated several regulations pursuant to the GLPA. Two of these regulations are particularly important here: one, 46 C.F.R. § 401.300, authorizes voluntary associations of U.S. registered pilots to establish pools in three districts of the U.S. waters of the Great Lakes; the other, 46 C.F.R. § 401.720(b), provides that “[wjhen pilotage service is not provided by the association authorized under 46 U.S.C. 9304 because of a physical or economic inability to do so, ... the Director [of Great Lakes Pilotage of the Coast Guard] may order any U.S. registered pilot to provide pilotage service.” Only District One — which covers portions of the St. Lawrence River and Lake Ontario — is at issue in this case. Id. § 401.300(a)(1); see also Decl. of Paul M. Wasserman ¶¶ 10-11 (May 28, 2008), reprinted in Joint Appendix (“J.A.”) 455-56.
District One is comprised of two areas: the waters in Area 1, which include portions of the St. Lawrence River, and the waters in Area 2, which include Lake Ontario. Decl. of Paul M. Wasserman ¶¶ 10-11 (May 28, 2008), J.A. 455-56. A single pilot can be qualified to navigate vessels in both areas, although Area 2 pilots must be qualified to navigate a vessel both into a port and from “pilot boat to pilot boat,” *324 i.e., a vessel that is only passing through Lake Ontario. Id. ¶ 17, J.A. 459.
B. Procedural Background
At all times relevant to this litigation, the SLSPA was the only pilotage pool authorized by the Coast Guard in District One. In order to become a member of the SLSPA, a pilot must be recommended by the voting members of the SLSPA and purchase one share (worth approximately $60,000) of Seaway Pilots Inc., the corporate entity through which the SLSPA purchases pilot boats and other property. Menkes was a member of the SLSPA until 2000, at which point he tendered his equity stake in Seaway Pilots Inc. and resigned from the Association. Following his resignation from the SLSPA, Menkes informed the Coast Guard that “I am still a U.S. Registered Pilot ... [, and] I maintain my right to be dispatched.” Letter from Richard J. Menkes to Frank J. Flyntz, Director, Great Lakes Pilotage (July 24, 2000), reprinted in J.A. 138.
The Director of Great Lakes Pilotage of the Coast Guard, Frank J. Flyntz, dispatched Menkes as an independent pilot for the 2001 navigation season. Flyntz explained his actions as follows:
Captain Menkes will remain in District [One] as a U.S. registered pilot and be available for dispatch whether or not he belongs to a pilotage pool. A pilotage pool is a voluntary association of registered pilots. 46 U.S.C. § 9304. There is no mandatory requirement in statute or regulation that requires Great Lakes registered pilots to belong to a pool in order to provide pilotage service. Captain Menkes’ resignation from the SLSPA does not prevent him from being dispatched nor does it provide any basis for the Coast Guard to deny him the opportunity to continue to earn his livelihood as a U.S. registered pilot. Captain Menkes has a vested property right in his certificate of registration that the Coast Guard cannot revoke simply because he does not belong to a pilotage pool----Furthermore, as I stated in my letter to the SLSPA dated February 26, 2001, there is a serious need for qualified pilots in District [One] and, as I previously determined, the SLSPA has not physically provided adequate pilot-age service in accordance with 46 C.F.R. § 401.720(b).
Letter from F.J. Flyntz, Director, Great Lakes Pilotage to Roger Paulus, President, SLSPA at 1 (Mar. 7, 2001) (emphasis in original), reprinted in J.A. 131. The SLSPA appealed Flyntz’s determination. The disputed decision was upheld, albeit on different grounds, by J.P. High, the Coast Guard’s Director of Waterways Management. High concluded that, “[a]s the Director may order any U.S. Registered Pilot to provide pilotage service in situations such as those found by the Director to currently exist, I find that the Director’s order to Captain Menkes was a valid exercise of his authority [under 46 C.F.R. § 401.720(b) ].” Letter from J.P. High, Director of Waterways Mgmt., to Mark Ruge, Preston, Gates, Ellis & Rouvelas, Meeds LLP at 3 (May 22, 2001) (emphasis in original), reprinted in J.A. 127.
Menkes served as an independent pilot in Area 1 of District One during the 2001, 2002, and 2003 navigation seasons. Each season runs from the end of March until the end of December. In August 2003, the SLSPA wrote then-Acting Director of the Office of Great Lakes Pilotage of the Coast Guard, Paul Wasserman, insisting that the Association was fully able to provide all necessary pilotage service in District One. Letter from SLSPA to Paul Wasserman, Acting Director, Office of Great Lakes Pilotage (Aug. 20, 2003), reprinted in J.A. 97. Wasserman disagreed in part and renewed the Coast Guard’s determination that the SLSPA was unable to provide adequate *325 pilotage service through the end of the 2003 navigation season. However, Wasserman stated that, at the end of the 2003 season “[this] determination, and Captain Menkes’ appointment as an independent pilot, will naturally expire.” Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Roger Paulus & Richard Menkes at 2 (Dec. 29, 2003), reprinted in J.A. 77. Wasserman added that he would “continue to monitor the status of the SLSPA after the 2003 navigation season to determine whether the services of any independent pilots will be required for the 2004 navigation season.” Id. In a subsequent letter responding to Menkes’s claim “that [his] status as an independent pilot in District One [was] a permanent circumstance,” Wasserman made it clear that “[Menkes’s] status as an independent pilot has been predicated on a determination by my office that an extraordinary circumstance exists, which I have not made for any future navigation seasons.” Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Richard Menkes at 1 (Jan. 22, 2004), reprinted in J.A. 73.
Menkes’s appeal of Wasserman’s decision was rejected by T.H. Gilmour, the Assistant Commandant for Marine Safety. Gilmour found that Flyntz’s 2001 decision to dispatch Menkes
was based on [Flyntz’s] determination that the SLSPA could not physically provide adequate pilotage service and there was a serious need for additional qualified pilots in District One. Captain Menkes’ continued service as an independent pilot was, and is, contingent upon that extraordinary circumstance remaining in effect.
Letter from T.H. Gilmour, Real Admiral, U.S. Coast Guard to Edward M. Gleason, Beins, Axelrod, Kraft, Gleason & Gibson, P.C. (“Gilmour Letter”) at 1 (Apr. 12, 2004) (emphasis added), reprinted in J.A. 68. Gilmour added that “Captain Menkes is free to apply to the SLSPA for membership in that association.” Id. at 2, J.A. 69.
In August 2004, Menkes filed suit in the District Court against the Government, alleging that the Coast Guard violated his First Amendment associational rights, his Fifth Amendment due process rights, and the APA in determining that his appointment as an independent pilot in District One had expired. He sought injunctive relief, cease-and-desist orders, and such other relief as appropriate. The District Court granted the Government’s motion to dismiss Menkes’s claims under Fed. R.Crv.P. 12(b)(1) and 12(b)(6). Menkes I, 402 F.Supp.2d 204 (D.D.C.2005). The court held that the Coast Guard’s actions were “committed to agency discretion by law,” and, accordingly, not reviewable under the APA. Id. at 207-09. In addition, the District Court dismissed Menkes’s First Amendment claim on the ground that the Coast Guard had not required Menkes to join the SLSPA as a condition of employment, id. at 209-10, and it dismissed his Fifth Amendment claim on the ground that neither the statute nor the applicable regulations created “an entitlement to the authorization of working as an independent pilot in a district with an approved pilotage pool,” id. at 210.
On appeal, we reversed the District Court’s judgment and vacated the decision of the Coast Guard. We first concluded that the Coast Guard’s determination was reviewable under the APA. Menkes II, 486 F.3d at 1312-13. We declined, however, to address Menkes’s statutory claim, because the Coast Guard had yet to offer an explicit interpretation of the statute or the applicable regulations. We explained that
[i]t is not appropriate for us to decide appellant’s statutory argument — that giving a preference to the Association conflicts with the controlling statute’s use of “voluntary association” — at this *326 time. We cannot pass comfortably on that question because we do not have a forthright agency interpretation of the statute. Paradoxically, the government argues that we should give deference to its interpretation under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984). But putting aside the question raised by United States v. Mead Corp., 533 U.S. 218 [121 S.Ct. 2164, 150 L.Ed.2d 292] (2001)— whether an interpretation advanced only in an informal adjudication is entitled to deference — in this case we do not have an explicit agency interpretation of either the statute or the regulation to evaluate. To be sure, section 401.720(b) could be read to imply a preference for the Association. The Wasserman and Gilmour letters could also be read to suggest as much. But an implication is not an agency interpretation, and we are disinclined to tease out, from the welter of correspondence in this case, an interpretation the agency itself has failed to offer. The statutory question is potentially a difficult one. The Coast Guard must come to grips with the meaning of the statute, and, particularly, the meaning of the term “voluntary association.” An agency interpretation is not only necessary to meet appellant’s administrative law challenge, it is also essential ... to meet his constitutional claims.
Id. at 1313-14 (footnote omitted).
We likewise declined to evaluate Menkes’s argument that the agency acted arbitrarily and capriciously in denying him an appointment for the 2004 navigation season, noting that “the Coast Guard has offered no explanation regarding the changed conditions from the 2003 to 2004 navigation season, and on remand it will be obliged to do so.” Id. (footnote omitted). The case was remanded “to the district court with instructions to remand the APA claim to the Coast Guard for further proceedings.” Id. at 1315. The District Court was instructed to “retain jurisdiction over appellant’s constitutional claims, but hold them in abeyance pending the Coast Guard’s response to the remand.” Id.
On remand, the agency “invite[d] Mr. Menkes to submit any evidence or arguments he would like the Coast Guard to consider.” Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan G. Axelrod, Benis[sic], Axelrod & Kraft, P.C. at 1 (Aug. 9, 2007), reprinted in J.A. 317. Menkes’s counsel wrote the agency and contended that: (1) a Coast Guard-designated “voluntary association” is required to dispatch willing, registered pilots regardless of whether they are members of the association; (2) the Coast Guard erred in determining that Menkes’s status as an independent pilot expired at the conclusion of the 2003 navigation season; and (3) the Coast Guard never found that the SLSPA could provide adequate pilotage service for the 2004 navigation season. Letter from Jonathan G. Axelrod to Paul M. Wasserman, Director, Great Lakes Pilotage (Oct. 9, 2007), reprinted in J.A. 336-47.
In an exhaustive decision, the Coast Guard addressed the issues raised by this court in Menkes II and by Menkes’s counsel in his submission on remand. In this decision, the Coast Guard set forth in detail the agency’s interpretation of “voluntary association” under 46 U.S.C. § 9304, explained the rights and responsibilities of such associations under the statute and agency regulations, and clarified the rights of unaffiliated, independent pilots. The principal judgments made by the Coast Guard are as follows:
• The statutes governing Great Lakes pilotage and the implementing Coast Guard regulations do not require certificated pilots’ associations to dispatch every registered, licensed, and quali *327 fied pilot who desires to provide pilot-age services.
• Certificated pilots’ associations are primarily responsible for providing adequate pilotage services, and that includes deciding whether or not to dispatch non-member pilots.
• Only when a certificated pilots’ association is not providing adequate pilot-age service would the Director deviate from the policy of placing primary responsibility for providing pilotage service with the certificated pilots’ association and intervene to ensure that adequate pilotage service is provided or notify vessels that a pilot is not available. This is a longstanding policy based in part on the Coast Guard’s interpretation of the Great Lakes pilotage regulations, dating at least back to about 1975.
• The Coast Guard does not interpret the phrase “voluntary association” found in 46 U.S.C. § 9304, and in the Coast Guard’s implementing regulations, to mean that a certificated pilots’ association must dispatch every registered, licensed, and qualified pilot who desires to provide pilotage service. Any such language in Flyntz’s letter was never an authoritative statement of the agency’s interpretation of the phrase “voluntary association.”
• Since Congress has not provided a specific meaning or definition for the phrase “voluntary association,” the Coast Guard may interpret the phrase to give it a meaning that is reasonable and consistent with the purpose of 46 U.S.C. § 9304 and 46 U.S.C. Chapter 93 as a whole.
• An association is a collection of persons joined together for a certain object, and an unincorporated association is not a legal entity distinct from the persons who are members. Membership in a voluntary unincorporated association is generally held to be a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced. Congress used the phrase “voluntary association” to mean only a collection of persons joined together for a certain purpose, and not a legal entity distinct from the persons who are members. The Coast Guard considers this to be a reasonable interpretation of the phrase as it is used in 46 U.S.C. § 9304, and this meaning is consistent with the purpose of that provision and 46 U.S.C. Chapter 93 as a whole.
• If Congress had intended 46 U.S.C. § 9304 to have the meaning that Menkes asserts, it would have used the word “voluntary” with “pool” to indicate that the pool should be open to anyone wanting to provide pilotage service; although, even in that case, the intent of the phrase would not be plain. But, as it is, Congress used the phrase “voluntary association.” Interpreting the word voluntary to mean that the association should be open to anyone wanting to provide pilotage service is not plain from the statutory language, and such an interpretation would do Menkes no good, because he specifically does not want to join the SLSPA.
• With respect to pilots’ associations, and Great Lakes pilots’ associations in particular, in the more than forty years since the GLPA was enacted, persons wanting to join a pilots’ association apply to become a member and the pilots’ association admits those it chooses to accept and who can meet the requirements to become a registered, licensed, and qualified pilot.
• Congress intended to regulate pilotage on the Great Lakes and intended to give the Coast Guard authority to delegate to certificated pilots’ associations *328 the operation of pilotage pools “to provide for efficient dispatching of vessels and rendering of pilotage services.” 46 U.S.C. § 9304. It is the Coast Guard’s view that this should include allowing the certificated pilots’ associations to decide if they will dispatch non-member pilots. Of course, the certificated pilots’ associations’ power to operate pilotage pools is always subject to the Director’s authority to register Great Lakes pilots, in accordance with 46 C.F.R. Part 401, Subpart B; to set pilotage rates with target compensation based on an assumed reasonable number of pilots to provide adequate pilotage service, in accordance with 46 C.F.R. Part 404; and to generally oversee the provision of pilotage services in accordance with 46 U.S.C. Chapter 93 and 46 C.F.R. Chapter III.
• The agency’s authorized delegation of primary responsibility for the operation of pilotage pools to certificated pilots’ associations is in the public interest.
• The Coast Guard has no interest in whether Menkes joins the SLSPA or any other pilots’ association. That is a matter entirely up to him and to the pilots’ association if he wants to apply for membership.
This material is drawn from the Agency Decision on Remand from the Court of Appeals for the District of Columbia and the District Court for the District of Columbia in the Case of Richard J. Menkes v. Dep’t of Homeland Sec., et al. (June 2, 2008) (“Agency Decision on Remand ”) at 8-16, reprinted in J.A. 286-94. [Because it is not otherwise easily accessible online or elsewhere, a substantial portion of the Agency Decision on Remand is reprinted in the Appendix to this opinion.]
The agency also addressed the need for pilots in Area 2 during the 2004 navigation season. Relying on a declaration by Wasserman, the Coast Guard found that
at the end of the 2003 navigation season, even allowing for a modest increase in bridge hours [the hours a pilot is aboard a vessel providing basic pilotage service] in the 2004 navigation season, there was no reason for Mr. Wasserman to believe that more than four pilots would be needed for the 2004 navigation season in Area 2. Considering that the SLSPA expected to have four pilots available for service in Area 2, it did not appear that there would be a great need for Area 1 pilots to work in Area 2 and that the SLSPA could provide adequate pilotage service without Mr. Menkes being ordered to provide pilotage service [in Area 1].
Agency Decision on Remand at 33-34, J.A. 311-12; see also Decl. of Paul M. Wasserman (May 28, 2008), J.A. 451-61 (explaining basis for Wasserman’s decision to allow Menkes’s appointment as independent pilot to expire).
The parties returned to the District Court, where both Menkes and the Government filed new cross-motions for summary judgment. The District Court denied Menkes’s motion and granted the Government’s. Menkes III, 662 F.Supp.2d 62 (D.D.C.2009). It first rejected Menkes’s argument that he should be allowed to conduct extra-record discovery, holding that Menkes failed to make a sufficient showing that the Coast Guard acted in bad faith. Id. at 69-70 & n. 5. Second, the court found the Coast Guard’s interpretation of the term “voluntary association” both reasonable and consistent with the agency’s actions. Id. at 70. Third, the court found that, despite Wasserman’s and Gilmour’s use of the term “extraordinary circumstance” in their 2003 and 2004 letters, the Coast Guard did not apply an improper standard in determining that the *329 SLSPA likely would have an adequate number of pilots available for the 2004 navigation season. See id. at 71. Finally, the court found that it was unreasonable for Menkes to believe that Flyntz’s 2001 letter gave him a permanent right to dispatch as an unaffiliated, independent pilot. Id. at 71-73.
The District Court also found for the Government with respect to Menkes’s constitutional claims. The court held that Menkes’s First Amendment claim was precluded by the Second Circuit’s decision in SLSPA, in which that court rejected Menkes’s First Amendment claim against the SLSPA. Id. at 73. The District Court also held that Menkes’s due process claim under the Fifth Amendment failed because Menkes did not have a protected property interest in serving as a pilot in a specific area of the Great Lakes. Id. at 73-74.
Menkes appeals from the District Court’s ruling that the Coast Guard’s interpretation of the term “voluntary association” was consistent with 46 U.S.C. § 9304. He also appeals from the District Court’s disposition of his remaining APA and constitutional claims.
II. Analysis
A. Standard of Review
Our review of the District Court’s grant of summary judgment, including its legal determinations regarding Menkes’s First Amendment and due process claims, is de novo. See Howmet Corp. v. EPA, 614 F.3d 544, 549 (D.C.Cir.2010). We review the District Court’s denial of Menkes’s request for additional discovery for an abuse of discretion. United States v. Deloitte LLP, 610 F.3d 129, 134 (D.C.Cir.2010). Within that abuse of discretion standard, however, we review whether the District Court applied the correct legal standard de novo. Id. Menkes’s claim that the Coast Guard’s interpretation of “voluntary association” in 46 U.S.C. § 9304 is at odds with the statute is reviewed under the two-part test enunciated by the Supreme Court in Chevron. See Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778.
As for Menkes’s assertion that the Coast Guard violated the APA in its decision-making,
the arbitrary and capricious standard governs review of all proceedings that are subject to challenge under the APA. See Consumers Union of U.S., Inc. v. FTC, 801 F.2d 417, 422 (D.C.Cir.1986). Thus, if an action is subject to review under the APA, it does not matter whether it is a formal or informal adjudication or a formal or informal rule-making proceeding — all are subject to arbitrary and capricious review under [5 U.S.C.] § 706(2)(A).
Harry T. Edwards & Linda A. Elliott, Federal Standards of Review — Review of District Court Decisions and Agency Actions 167 (2007) (emphasis in original).
Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
Motor Vehicle Mfrs. Ass’n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
B. Statutory Interpretation of “Voluntary Association ”
Menkes does not claim that the Coast Guard violated the APA when it issued the Agency Decision on Remand without first engaging in notice-and-comment rulemaking. And for good reason.
*330 The Supreme Court has made it clear that “the fact that [an] Agency ... reachefs an] interpretation through means less formal than ‘notice and comment’ rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due.” Barnhart v. Walton, 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (citation omitted). Menkes’s sole objection here is that the Coast Guard’s interpretation of the term “voluntary association” in 46 U.S.C. § 9304 is manifestly at odds with the terms of the GLPA and thus arbitrary and capricious under the APA.
In addressing Menkes’s claim, we must first determine whether the agency’s interpretation of the statute' — including its construction of “voluntary association” and its explanation of an association’s responsibilities vis-a-vis the Coast Guard and independent pilots — deserves Chevron deference. Menkes does not contest the applicability of Chevron. Appellant’s Br. at 16 (“Chevron ... controls the Court’s review of an administrative agency decision.”). Nevertheless, in light of the concerns raised by the court in Menkes II, 486 F.3d at 1313-14, we are constrained to address the degree of deference due, if any, to the Coast Guard’s construction and application of the statute.
Under Chevron, if a
court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.
The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778 (ellipsis in original) (footnotes and quotation omitted). The statute at issue here states that
(a) The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.
(b) For pilotage pools, the Secretary may—
(1) limit the number of the pools;
(2) prescribe regulations for their operation and administration;
(3) prescribe a uniform system of accounts;
(4) perform audits and inspections; and
(5) require coordination on a reciprocal basis with similar pool arrangements authorized by the appropriate agency of Canada.
46 U.S.C. § 9304. The statute does not directly address the precise questions at issue in this case. However, there is no doubt that the statute provides an “ex *331 press delegation of authority to the agency to elucidate” the terms of § 9304. It is also clear that the Coast Guard acted pursuant to this congressionally delegated authority in adopting regulations governing pilotage on the Great Lakes and in amplifying its interpretation of the statute in its Agency Decision on Remand. Therefore, the Secretary’s regulations and the Agency Decision on Remand are “legislative regulations [that must be] given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.”
It does not matter that the Agency Decision on Remand — in which the Coast Guard amplified its position on the meaning of “voluntary associations” and explained the rights of unaffiliated, independent pilots — is a judgment rendered in an adjudication rather than in a rulemaking procedure.
The Supreme Court has explained that [Chevron ] Step Two deference ... comes into play when an agency has acted within the area in which Congress has authorized it to act, and the action at issue was taken pursuant to congressionally delegated authority to make law and with the intent on the part of the agency to act with the force of law. [United States v. Mead Corp., 533 U.S. 218, 226-27 [121 S.Ct. 2164, 150 L.Ed.2d 292] (2001) ]. As Mead explains, “[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force.” Id. at 230 [121 S.Ct. 2164]. The absence of rule-making or adjudicatory procedures is not dispositive, however, for the Court has “sometimes found reasons for Chevron deference even when no such administrative formality was required and none was afforded.” Id. at 231 [121 S.Ct. 2164].
Harry T. Edwards & Linda A. Elliott, Federal Standards of Review — Review of District Court Decisions and Agency Actions 152 (2007).
Menkes’s arguments fall far short of showing that the Coast Guard’s interpretation of 46 U.S.C. § 9304 is manifestly contrary to the statute or otherwise arbitrary and capricious. First, the Coast Guard was acting pursuant to an express delegation from Congress. The GLPA specifically allows the Coast Guard to “authorize the formation of a pool by a voluntary association of United States registered pilots.” 46 U.S.C. § 9304. And the statutory mandate gives the Coast Guard the explicit authority to set parameters for voluntary associations. See id. § 9304(b).
Second, the Coast Guard’s Agency Decision on Remand addresses interstitial questions, see Walton, 535 U.S. at 222, 122 S.Ct. 1265, that are bound up with the administration of the Coast Guard’s scheme of regulating pilotage on the Great Lakes. If the Coast Guard had adopted Menkes’s proposal that independent pilots must be dispatched on equal terms with members of voluntary associations, this could have incentivized other member pilots — like Menkes — to resign their association membership because they could receive the benefit of being dispatched without the burden of paying for an equity stake in a voluntary association. See Letter from Richard J. Menkes to Paul M. Wasserman, Acting Director of Great Lakes Pilotage (July 8, 2003), reprinted, in J.A. 98 (explaining Menkes’s position that “[i]f five pilots are called for in the rates, I would be entitled to one fifth of all U.S. dispatches; if the number of pilots called for is six, then I would get one sixth of all U.S. dispatches, and so on”). This could have impacted myriad *332 aspects of the regulatory scheme, 46 C.F.R. § 401.300 et seq., including the Coast Guard’s discretion to “determinen that a pool is necessary for the efficient dispatching of vessels and the providing of pilotage services in the area concerned,” id. § 401.320(a). After all, if an association had to dispatch every willing, nonmember registered pilot, this could affect the Coast Guard’s calculus of whether the formation of a pool in a particular district would be efficient. In sum, the potential ramifications of the agency’s decision confirm that these are precisely the sort of complex, interstitial questions that the Coast Guard deserves deference to address. See Mylan Labs., Inc. v. Thompson, 389 F.3d 1272, 1280 (D.C.Cir.2004) (according Chevron deference to FDA letter due to “complexity of the statutory regime under which the FDA operates, the FDA’s expertise [and] the careful craft of the scheme it devised to reconcile the various statutory provisions”).
Furthermore, the Coast Guard’s interpretation, as clarified in the Agency Decision On Remand, reflects a longstanding agency policy. The Coast Guard explained that the policy dates back to around 1975, Agency Decision on Remand at 9, J.A. 287, and Menkes has provided no evidence to the contrary. In fact, in a letter sent by Menkes in 1978, he acknowledged that
[i]t is my understanding that the Great Lakes Pilotage System allowed only licensed pilots who were members of the designated pilot association ... to operate vessels unless an appropriate waiver has been obtained for such pilotage. Even waivers, to the best of my knowledge, do not allow pilots who were former members of the association without any affiliation, to pilot vessels in the Great Lakes System.
Letter from Richard J. Menkes to George R. Skuggen, Director, Great Lakes Pilot-age Staff (Mar. 27, 1978), reprinted in J.A. 144. Although, as noted above, F.J. Flyntz arguably voiced a different view in his 2001 letter authorizing Menkes to be dispatched, Flyntz’s determination was appealed by the SLSPA. On appeal, Flyntz’s disputed decision was modified by his superior, J.P. High, the Coast Guard’s Director of Waterways Management, who upheld the decision solely on the ground that Menkes could be dispatched because the SLSPA was not providing adequate pilotage service. See Letter from J.P. High, Director of Waterways Mgmt., to Mark Ruge, Preston, Gates, Ellis & Rouvelas, Meeds LLP at 2-3 (May 22, 2001), J.A. 126-27. High did not adopt Flyntz’s interpretation of the GLPA. Because High’s construction of the statute displaced Flyntz’s, it is evident that Flyntz’s interpretation was never controlling.
It is highly significant here that the agency’s “interpretation is one of long standing.” Walton, 535 U.S. at 221, 122 S.Ct. 1265. And it does not matter that the Coast Guard “reached its interpretation through means less formal than ‘notice and comment’ rulemaking,” id., especially when Menkes has not challenged the method used by the agency to amplify its regulations. Benkelman Tel. Co. v. FCC, 220 F.3d 601, 607 n. 10 (D.C.Cir.2000) (finding argument that agency violated APA by failing to utilize notiee-and-comment rulemaking waived).
Surely, the Coast Guard’s enunciation of the aforecited statutory interpretations and rules has the “force of law,” Mead, 533 U.S. at 232, 121 S.Ct. 2164, especially given the instruction from this court to the agency to “come to grips with the meaning of the statute.” Menkes II, 486 F.3d at 1314. The court’s remand order did not instruct the agency to conduct notice-and-comment rulemaking or a formal adjudication, nor did Menkes request either procedure. In these circumstances, we think it *333 is clear under Mead and Walton that Chevron applies. And not only does the deferential Chevron framework apply to the Coast Guard’s interpretation of 46 U.S.C. § 9304, but, to the extent that the Coast Guard’s Agency Decision on Remand reflects the agency’s interpretation of its own regulations — here, 46 C.F.R §§ 401.300, 401.720(b) — it deserves even greater deference. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); see also Chase Bank USA, N.A. v. McCoy, — U.S. -, 131 S.Ct. 871, 880-82, 178 L.Ed.2d 716 (2011) (deferring to agency’s interpretation of its own regulation, advanced in legal brief, because “the interpretation ... is consistent with the regulatory text”).
Applying the Chevron framework, we conclude that the Coast Guard’s policy is easily upheld. Chevron Step One requires that we “examine[ ] the statute de novo in order to determine ‘whether Congress has directly spoken to the precise question at issue.’ ” Eagle Broad. Grp., Ltd. v. FCC, 563 F.3d 543, 550 (D.C.Cir.2009) (quoting Chevron, 467 U.S. at 842, 104 S.Ct. 2778). It is not clear from the text of 46 U.S.C. § 9304 whether a voluntary association can decide to dispatch only its members, for the term “voluntary association” is undefined. Nor are there any hints in the GLPA’s limited legislative history as to how Congress wished to resolve this question. See H.R.Rep. No. 86-1666 (1960), reprinted in 1960 U.S.C.C.A.N. 2481. Congress thus did not definitively answer the question at issue. Menkes’s argument that an association cannot be “voluntary” if membership is a necessary precondition for employment is a non-sequitur.
Moving on to Chevron Step Two, we are obliged to defer to the agency’s interpretation if it is “based on a permissible construction of the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778; see also Net-Coalition v. SEC, 615 F.3d 525, 533 (D.C.Cir.2010) (noting that “we accept the agency’s interpretation of the statute as long as it is reasonable”). The Coast Guard contends that its position is in furtherance of the public interest because
it removes the Director [of Great Lakes Pilotage] from day to day involvement in the operation of the pilotage pools and allows him to focus on oversight of the Great Lakes pilotage operations. It also allows the pilots’ associations that traditionally have brought organization and efficiency to the provision of pilot-age service to apply their expertise to the operation of the pool. And it promotes the availability of the necessary infrastructure for safe and efficient pilotage — such as pilot boats, and office functions including billing. It promotes retention of pilots, by giving the pilots in the association some control over decisions that will affect the financial health of the pilots, the pilots’ association and other entities that may provide infrastructure support to the pilots.
Agency Decision on Remand at 15, J.A. 293. These justifications are reasonable, and Menkes does not question them.
In sum, we have no trouble concluding that the Coast Guard’s interpretations of the statute and its implementing regulations are neither manifestly contrary to the statute nor arbitrary and capricious.
C. First Amendment
Menkes also argues that the Coast Guard violated his First Amendment right of association by requiring him to become a member of the SLSPA in order to be dispatched as a pilot in District One. It appears that this claim is precluded because the Second Circuit decided this issue against Menkes in SLSPA, a case in which Menkes brought suit against the SLSPA alleging, inter alia, that the SLSPA violat *334 ed Menkes’s First Amendment right of association.
This case involves defensive, non-mutual issue preclusion, because the Government — the party seeking to invoke preclusion — was not a party to the Second Circuit action. Issue preclusion applies “[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.” Restatement (Second) of Judgments § 27 (1982). Preclusion also must “not work a basic unfairness to the party bound by the first determination.” Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C.Cir. 1992). In addition, “issue preclusion does not require mutuality of parties.” Gov’t of Rwanda v. Johnson, 409 F.3d 368, 374 (D.C.Cir.2005) (citing Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).
The First Amendment issue pressed by Menkes here is identical to the one decided by the Second Circuit: whether requiring membership in the SLSPA as a condition of being dispatched by the Association as a District One pilot violated Menkes’s First Amendment rights. See Menkes v. SLSPA No. 06-CV-339, 2007 WL 167715, at *10 (N.D.N.Y. Jan. 18, 2007) (citing Menkes’s complaint). The Second Circuit decided this issue against Menkes on the merits, citing the Supreme Court’s decision in Keller v. State Bar of California, 496 U.S. 1, 8, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), to support the proposition that “the government can compel an individual to join a professional association as a condition of employment.” SLSPA, 269 Fed. Appx. at 56. Because the Second Circuit’s disposition of Menkes’s First Amendment claim was final and essential to the Second Circuit’s judgment dismissing his complaint, and neither in his briefs nor at oral argument did Menkes provide a plausible explanation as to why preclusion would be unfair, preclusion is appropriate.
Even if Menkes’s First Amendment claim were not precluded, it would fail on the merits. Menkes argues that Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), prevents the government from enabling a private association to require membership as a condition of employment. Abood, in fact, refutes Menkes’s argument. In Abood, the Court upheld a Michigan statute that permitted a union and a local government employer to enter into an “agency shop” agreement, whereby non-union members had to pay the union the equivalent of union dues as a condition of employment. The Court noted that “[t]o compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests.” Id. at 222, 97 S.Ct. 1782. Nonetheless, it found the “agency shop” agreement constitutionally justified by Congress’s assessment of the important contribution of these types of arrangements to the system of labor relations. Id. It follows from Abood that here, even if the Coast Guard’s interpretation of the term “voluntary association” in 46 U.S.C. § 9304 does impinge on Menkes’s First Amendment rights, any such interference is justified by the government’s interest in regulating pilotage on the Great Lakes.
The legislative history of the GLPA indicates the factors at issue in regulating Great Lakes pilotage — including the need for maritime safety, the need for coordination between the United States and Canada, and Congress’s push for the equitable participation of American nationals in Great Lakes pilotage. H.R.Rep. No. 86-1666, at 3^1 (1960), reprinted in 1960 U.S.C.C.A.N. 2481, 2483-84. By giving voluntary associations the discretion to dispatch members, the Coast Guard is acting *335 in furtherance of these legitimate interests. See Agency Decision on Remand at 15, J.A. 293 (explaining why the Coast Guard’s policy is in the public interest). These interests are sufficient to satisfy Abood. See also Keller, 496 U.S. at 13-14, 110 S.Ct. 2228 (holding that “compelled association” of state bar was justified by the “State’s interest in regulating the legal profession and improving the quality of legal services”); Ry. Emps.’ Dep’t, Am. Fed. of Labor v. Hanson, 351 U.S. 225, 238, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) (holding that provision of Railway Labor Act permitting a “union shop” clause, whereby every employee is obliged to pay union dues, did not violate First Amendment).
Menkes has not raised, and we need not address, whether a Coast Guard-designated pilots’ association could arbitrarily reject an applicant for membership in that association, or whether an association could refuse to dispatch a registered nonmember willing to pay all costs of membership, including the equity stake, and assume all responsibilities shared by association members. Here, although Menkes was willing to reimburse the SLSPA for expenses that the Association incurred on his behalf, he did not offer to purchase the equity stake, worth approximately $60,000, that members are required to purchase. Reply Br. at 9. Although Menkes cursorily alleges the SLSPA “engages in legislative and lobbying activities,” Appellant’s Br. at 4, he does not allege that the SLSPA used, or threatened to use, any of his funds for political or ideological activities unrelated to pilotage, which could run afoul of Abood, 431 U.S. at 236, 97 S.Ct. 1782. See also Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (construing Railway Labor Act to avoid constitutional question of whether union could spend employee’s dues for political causes that employee opposes).
Finally, Menkes’s reliance on NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), and Local 357, International Brotherhood of Teamsters v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), is entirely misplaced. These cases involved the legality of an agency shop agreement and a hiring hall arrangement under the National Labor Relations Act. Neither decision addressed the First Amendment.
D. The Coast Guard’s Decision That Menkes’s Appointment as an Independent Pilot Expired After the 2003 Season
Menkes proffers a hodgepodge of arguments for why the Coast Guard’s decision not to dispatch him as an independent pilot during the 2004 season was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). None of these arguments carry the day.

1. Wasserman’s Declaration

Menkes first focuses on the statement in Wasserman’s declaration, which was offered to supplement the administrative record pursuant to our remand in Menkes II, that
[i]n letters dated November 5, 2003, and December 15, 2003, and in informal communications that continued through March of 2004, the SLSPA ... convinced me that the pilots’ association really would be able to resolve the attrition issue in Area 2 and have an adequate number of pilots there during the 2004 navigation season.
Decl. of Paul M. Wasserman ¶ 16 (May 28, 2008), reprinted in J.A. 459. Menkes contends that the SLSPA’s November 5 and December 15 letters do not support a conclusion that the SLSPA had cured its performance problems with respect to Area 2. We disagree. The letters clearly provide *336 support for the view that the SLSPA had not been responsible for the problem of pilot attrition in Area 2. To the extent that the attrition problem was attributable to the Association, the December 15 letter notes the Association’s “recent recruitment and training successes” and sets forth proposed modifications to the pay structure for pilots-in-training intended to forestall discontent of new members. Letter from Roger S. Paulus, President, to Paul M. Wasserman, Acting Director, Great Lakes Pilotage at 2 (Dec. 15, 2003), reprinted in J.A. 82. In light of these letters, it was reasonable for Wasserman to conclude that the Association deserved a chance to provide adequate pilotage service for the 2004 season.
Menkes also argues that the Coast Guard’s decision was arbitrary and capricious, because Wasserman’s reliance on “informal communications” does not reveal either the facts upon which he relied or his sources of information. While it is true that the record does not contain a log of each communication between the SLSPA and Wasserman in 2003, Wasserman’s declaration does provide a detailed explanation of the reasons justifying Wasserman’s belief that the SLSPA likely would be able to provide adequate pilotage service in the 2004 season. Wasserman concluded that no more than six pilots would be necessary to provide adequate pilotage service in Area 1 and that the SLSPA had seven of its own pilots qualified for the area, making Menkes’s services unnecessary. Deck of Paul M. Wasserman ¶¶ 13-19 (May 28, 2008), J.A. 457-61. Menkes offers nothing to suggest that these calculations were in error or a fabrication.
Reading Wasserman’s reference to “informal communications” in context, it is evident that the informal communications provided factual support for the information and calculations that led Wasserman to conclude that the SLSPA could dispatch a sufficient number of its own pilots to provide adequate pilotage service in 2004. E.g., id. ¶ 17, J.A. 460 (“[B]y the end of December, 2003, the SLSPA had verbally requested, and I had verbally approved, authority to open a pilot selection process to hire additional [Area 2] pilots in time for the 2004 season.”). In fact, Menkes himself wrote the Coast Guard complaining of a surplus of pilots during the 2003 navigation season. Letter from Richard J. Menkes to Paul M. Wasserman, Acting Director of Great Lakes Pilotage (July 8, 2003), reprinted in J.A. 98 (“At the present time [the SLSPA] employfs] too many pilots for the amount of traffic using the Seaway, and this year is proving to be one of the slowest navigation seasons on record.”).
At bottom, Menkes argues that the Coast Guard’s decision is arbitrary and capricious because it fails to record each of the agency’s informal communications with the SLSPA. We decline to adopt such a rigid rule. See Menkes II, 486 F.3d at 1314 (“[T]his was an informal adjudication, and it is common for the record to be spare in such cases.”); see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (“[W]e will uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.”). Here, it is clear that Wasserman had communicated with the SLSPA in 2003 and, as a result, became convinced of the merits of the Association’s plan to provide adequate pilotage service for all of District One during the 2004 season. Wasserman explained the basis of his decision through his on-the-record declaration, and that explanation is sufficient to survive arbitrary-and-capricious review.
Menkes also argues that Wasserman could not have written his December 29, 2003 letter terminating Menkes’s appointment based on communications “that con *337 tinued through March of 2004,” Decl. of Paul M. Wasserman ¶ 16 (May 28, 2008), J.A. 459. Although that is obviously true, the mere fact that Wasserman continued to communicate with the SLSPA in early 2004 about this issue does not indicate that Wasserman had no rational basis for his December 2003 decision to let Menkes’s appointment expire. Indeed, Wasserman’s behavior was consistent with the statement in his December 2003 letter to Menkes and the SLSPA that he would “continue to monitor the status of the SLSPA after the 2003 navigation season to determine whether the services of any independent pilots will be required for the 2004 navigation season.” Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Roger Paulus & Richard Menkes at 2 (Dec. 29, 2003), J.A. 77.
Menkes also contends that Wasserman’s declaration is an impermissible post hoe rationalization for the Coast Guard’s action. This argument is meritless. Wasserman’s declaration was presented in response to this court’s direction to the Coast Guard to offer an “explanation regarding the changed conditions from the 2003 to 2004 navigation season” on remand. Menkes II, 486 F.3d at 1314. “Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives.” Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C.Cir. 2006). As we noted in Local 814, International Brotherhood of Teamsters v. NLRB, 546 F.2d 989, 992 (D.C.Cir.1976) (per curiam):
The “post hoc rationalization” rule is not a time barrier which freezes an agency’s exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers.
Because Wasserman is a “proper decision-maker,” his declaration — which explains why the agency allowed Menkes’s appointment to lapse in 2003 — is not an impermissible post hoc rationalization.
2. “Extraordinary Circumstance ” Standard
Menkes goes on to argue that the Coast Guard’s position that unaffiliated, independent pilots could only be dispatched in the event of an “extraordinary circumstance” is a stricter standard than the regulatory requirement of a “physical or economic inability to [provide service],” 46 C.F.R. § 401.720(b), and that the Coast Guard originally used the “extraordinary circumstance” standard to allow Menkes’s appointment as an independent pilot to expire. This issue was highlighted in Menkes II. We noted that Wasserman’s use of the phrase “extraordinary circumstances” in his January 22, 2004 letter “seems to be an unexplained, stricter threshold for the appointment of nonmember pilots than the regulation’s text contemplates.” 486 F.3d at 1314. In its decision on remand, however, the Coast Guard clarified that “[t]he phrase ‘extraordinary circumstance’ was only used as a way to describe the inability of the pilots’ association to provide pilotage service.” Agency Decision on Remand at 22, J.A. 300. The viability of the Coast Guard’s explanation is confirmed by Gilmour’s 2004 letter denying Menkes’s appeal, which made clear that the “extraordinary circumstance” to which Wasserman had referred in his December 2003 letter was the “determination that the SLSPA could not physically provide adequate pilotage service and there was a serious need for additional qualified pilots in District One.” Gilmour Letter at 1, J.A. 68. Consequently, contrary to Menkes’s claims, the Coast Guard did not *338 “repudiate[] its position,” Appellant’s Br. at 22, and did not act arbitrarily and capriciously in straying from the standard set forth in 46 C.F.R. § 401.720(b).

3. Specific Comparisons

Finally, Menkes argues that the Coast Guard did not comply with this court’s instruction in Menkes II to provide “specific comparisons” explaining why the Coast Guard’s view of the adequacy of the supply of pilots changed in 2004. Menkes II, 486 F.3d at 1314 n. 6. This claim also has no merit.
In his declaration, Wasserman explained that
[b]y December 22, 2003, at the end of the navigation season, there was one pilot remaining in Area 2 who was qualified to take vessels into the major ports on the Lake and there was one new pilot who would, shortly following the beginning of the 2004 season, be able to take vessels pilot boat to pilot boat. In addition, by the end of December, 2003, the SLSPA had verbally requested, and I had verbally approved, authority to open a pilot selection process to hire additional Lake pilots in time for the 2004 season.
Id. ¶ 17, J.A. 459-60. We can find no infirmity in the agency’s explanation, and Menkes offers nothing to convince us that the Coast Guard failed to comply with the court’s mandate in Menkes II.
E. Fifth Amendment
Menkes argues that the Coast Guard violated his Fifth Amendment due process right to a hearing when it decided that his appointment as an unaffiliated, independent pilot had expired. We find no merit in this claim.
A person cannot have a protected entitlement “if government officials may grant or deny [the benefit] in their discretion.” Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005). 46 C.F.R. § 401.720(b) permits the Coast Guard to order an unaffiliated, independent pilot to provide pilotage service if a designated voluntary association cannot provide such service due to a “physical or economic inability to do so.” This is a discretionary standard, and whether the SLSPA is able to provide adequate pilotage service is wholly out of Menkes’s control. See Glatt v. Chicago Park Dist., 87 F.3d 190 (7th Cir.1996) (holding that yacht owner did not have entitlement to particular slip in harbor, when Marine Director could change assigned slip on grounds of “efficiency” or to address other circumstances). Although Menkes benefitted from SLSPA’s inability to provide adequate pilotage service from 2001 through 2003, that, by itself, did not create a constitutionally protected right to continued dispatch absent a “legitimate claim of entitlement,” Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
Menkes’s contention that Flyntz’s 2001 letter bolstered his entitlement to continued dispatch is simply mistaken. As the District Court pointed out:
Flyntz’s statements did not represent Coast Guard policy. Furthermore, even assuming Flyntz’s statements were authoritative, the statement at best created a property interest in Menkes’s certificate of registration [as a United States pilot], not in his continued appointment. The Coast Guard’s decision only affects his ability to be dispatched in a specific area of the Great Lakes. It has no effect on his certificate of registration. Thus, even if Menkes has a property interest in his certificate of registration, he does not have a property interest in in [sic] serving as a pilot in a specific area.
*339 Menkes III, 662 F.Supp.2d at 74 (emphasis in original).
Even if Menkes did have a protected entitlement in being dispatched as an independent pilot, he received all the process that he was due under the Fifth Amendment. See Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Menkes had multiple opportunities to be heard by the Coast Guard on the issues that he has raised. For example, in January 2004, after Wasserman made his initial determination, Menkes appealed to Gilmour and explained why he believed that Wasserman had erred. Letter from Edward M. Gleason to Thomas Gilmour, Assistant Commander for Marine Safety (Jan. 28, 2004), reprinted in J.A. 52-54. Then, in 2007, after this court instructed the District Court to remand Menkes’s APA claims to the Coast Guard, the Coast Guard specifically “invite[d] Mr. Menkes to submit any evidence or arguments he would like the Coast Guard to consider.” Letter from Paul M. Wasserman, Director, Great Lakes Pilotage to Jonathan G. Axelrod, Benis[sic], Axelrod & Kraft, P.C. at 1 (Aug. 9, 2007), J.A. 317. Menkes made such a submission to the agency, to which the Coast Guard directly responded. Agency Decision on Remand at 35-37, J.A. 313-15. Thus, even if Menkes’s alleged right to dispatch was safeguarded by procedural due process rights, he received all the process that he was due because he had ample opportunity to apprise the Coast Guard of his views. See Dr. Pepper/Seven-Up Cos. v. FTC, 991 F.2d 859, 863 (D.C.Cir.1993) (“Assuming, arguendo, that [appellant] had a constitutionally protected interest at stake, we would nonetheless conclude that it was adequately protected by the informal procedures provided.”); see also Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 6-7 (D.C.Cir.1998) (notice and informal hearing sufficient to satisfy due process).
F. Request for Extra-Record Discovery
Finally, Menkes argues that the District Court erroneously denied his request to take discovery pertaining to Wasserman’s “informal communications” with the SLSPA. We disagree. The District Court applied the proper legal standard and did not abuse its discretion in denying Menkes’s request. In agency cases, limited extra-record discovery is only appropriate “when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.” Baptist Mem’l Hosp.-Golden Triangle v. Sebelius, 566 F.3d 226, 230 (D.C.Cir.2009) (quoting Commercial Drapery, 133 F.3d at 7). We can find no reason to question the District Court’s determination that Menkes “failed to make a sufficient showing the agency acted in bad faith.” Menkes III, 662 F.Supp.2d at 69.
III. Conclusion
For the reasons indicated in the foregoing opinion, the judgment of the District Court is affirmed.
APPENDIX
excerpts from

Agency Decision on Remand

June 2, 2008
The Coast Guard agrees with Mr. Menkes that certificated pilots’ associations may dispatch non-member pilots and that such pilots’ associations have in fact done so. However, the Coast Guard does not agree that the statutes governing Great Lakes pilotage or the implementing Coast Guard regulations require certificated pilots’ associations to dispatch every registered, licensed and qualified pilot who desires to provide pilotage services. It is *340 the Coast Guard’s position that certificated pilots’ associations are primarily responsible for providing adequate pilotage services, and that includes deciding whether or not to dispatch non-member pilots.... [0]nly when a certificated pilots’ association is not providing adequate pilotage service would the Director deviate from the policy of placing primary responsibility for providing pilotage service with the certificated pilots’ association and intervene to ensure that adequate pilotage service is provided or notify vessels that a pilot is not available. This is a longstanding policy based in part on the Coast Guard’s interpretation of the Great Lakes Pilotage regulations, dating at least back to about 1975.
The Coast Guard’s authority to authorize certificated pilots’ associations is found in 46 U.S.C. § 9304, which states: “The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.” Coast Guard regulations implementing that provision are found in 46 C.F.R. Part 401, Subpart C. The regulations contain qualifications and requirements for formation of a pool by a certificated pilots’ association, at 46 C.F.R. § 401.320, including, among other requirements, that the pilots’ association agree to provide pilots to vessels on a first-come, first served basis. Significantly, that regulation does not require the pilotage association to agree to dispatch or admit to the pool every registered, licensed and qualified pilot who desires to provide pilotage service.
The regulations also provide at 46 C.F.R. § 401.340 for the dispatching of non-member pilots. The regulation states in part: “[facilities and service of the pool may be denied to any U.S. Registered Pilot who fails or refuses to execute [authorizations relating to billing for services and compliance with work rules, among other things]. While the regulation specifically grants the pilots’ association authority to deny the facilities and services of the pool to pilots refusing to agree to important terms for participation in the pool, it does not explicitly address whether a pilots’ association must otherwise make the facilities and services of the pool available to non-member pilots. The Coast Guard does not interpret this provision as requiring the provision of the facilities and services of the pool to every pilot willing to make the required authorizations or to require the pilots’ association to dispatch every such pilot.
The Coast Guard also does not interpret the phrase “voluntary association” found in 46 U.S.C. § 9304, and in the Coast Guard’s implementing regulations to mean that a certificated pilots’ association must dispatch every registered, licensed and qualified pilot who desires to provide pilotage service. Mr. Flyntz’s letter of March 7, 2001, J.A. 120-21, to Captain Paulus of the SLSPA contains language emphasizing the word “voluntary” in 46 U.S.C. § 9304 and suggesting that the SLSPA and the Coast Guard had to allow Mr. Menkes to continue providing pilotage service after he left the SLSPA.
It is the Coast Guard’s position that any such language in Mr. Flyntz’s letter was never an authoritative statement of the agency’s interpretation of the phrase “voluntary association.” Moreover, even if it was, it was an aberration from the Coast Guard’s consistent position in more than forty years of regulating Great Lakes pilotage, and it was quickly superseded by the final agency action of Mr. High, in his letter dated May 22, 2001, J.A. 114-16, following the SLSPA’s appeal of Mr. *341 Flyntz’s letter. Mr. High’s letter did not endorse Mr. Flyntz’s novel interpretation of the phrase “voluntary association,” instead basing the denial of the SLSPA’s appeal on the authority of the Director to order a pilot to provide pilotage service in accordance with 46 C.F.R. § 401.720(b).
As a matter of statutory interpretation, it seems that if Congress had intended 46 U.S.C. § 9304 to have the meaning that Mr. Menkes asserts, it would have used the word “voluntary” with “pool” to indicate that the pool should be open to anyone wanting to provide pilotage service although, even in that case, the intent of the phrase would not be plain. But as it is, Congress used the phrase “voluntary association.” Interpreting the word voluntary to mean that the association should be open to anyone wanting to provide pilotage service is again not plain from the statutory language, and such an interpretation would do Mr. Menkes no good, because he specifically does not want to join the SLSPA.
Since Congress has not provided a specific meaning or definition for the phrase “voluntary association,” the Coast Guard may interpret the phrase and give it a meaning that is reasonable and consistent with the purpose of 46 U.S.C. § 9304 and 46 U.S.C. Chapter 93 as a whole. Naturally, we start with the plain meaning to the extent one can be ascertained. American Jurisprudence 2d, Volume 6, has a Title called “Associations and Clubs.” Section 1 of that title defines kinds of associations. It explains that an association is a collection of persons joined together for a certain object, and that any unincorporated association is not a legal entity distinct from the persons who are members. 6 Am Jur 2d, Associations and Clubs § 1. This section goes on to say:
The term ‘voluntary’ is frequently used in connection with the term ‘association’ or ‘society,’ and some principles of law are confined, in their operation, to ‘voluntary’ organizations. In this connection, the term means simply that the organization is one in which one may seek, or be accepted into, membership in the organization as a matter of choice. 6 Am Jur 2d, Associations of Clubs § 1.
With respect to pilots’ associations, and Great Lakes pilots’ associations in particular, in the more than forty years since the Great Lakes Pilotage Act of 1960 was enacted, persons wanting to join a pilots’ association apply to become a member and the pilots’ association admits those it chooses to accept and who can meet the requirements to become a registered, licensed and qualified pilot.
With respect to membership of voluntary associations, American Jurisprudence states:
Membership in a voluntary unincorporated association is generally held to be a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced. 6 Am Jur 2d, Association and Clubs § 18.
It is the Coast Guard’s position that Congress used the phrase “voluntary association” only in the sense suggested by the above mentioned language from American Jurisprudence 2d — i.e., a collection of persons joined together for a certain purpose, and not a legal entity distinct from the persons who are members. The Coast Guard considers this to be a reasonable interpretation of the phrase as it is used in 46 U.S.C. § 9304, and that this meaning is consistent with the purpose of that provision and 46 U.S.C. Chapter 93 as a whole.
*342 With respect to Great Lakes pilotage, the Coast Guard understands that Congress intended to regulate pilotage on the Great Lakes and intended to give the Coast Guard authority to delegate to certificated pilots’ associations the operation of pilotage pools “to provide for efficient dispatching of vessels and rendering of pilot-age services.” 46 U.S.C. § 9304. It is the Coast Guard’s view that this should include allowing the certificated pilots’ associations to decide if they will dispatch non-member pilots. Of course, the certificated pilots’ associations’ power to operate pilotage pools is always subject to the Director’s authority to register Great Lakes pilots, in accordance with 46 C.F.R. Part 401, Sub-part B; to set pilotage rates with target compensation based on an assumed reasonable number of pilots to provide adequate pilotage service, in accordance with 46 C.F.R. Part 404; and, to generally oversee the provision of pilotage services, in accordance with 46 U.S.C. Chapter 93 and 46 C.F.R. Chapter III.
The Coast Guard has determined that Congress intended to allow the agency to delegate primary responsibility for the operation of pilotage pools to certificated pilots’ associations, and that delegating that responsibility is in the public interest. That responsibility includes deciding whether or not to dispatch non-member pilots. Delegating responsibility to the certificated pilots’ associations is in the public interest because it removes the Director from day to day involvement in the operation of the pilotage pools and allows him to focus on oversight of the Great Lakes pilotage operations. It also allows the pilots’ associations that traditionally have brought organization and efficiency to the provision of pilotage service to apply their expertise to the operation of the pool. And it promotes the availability of the necessary infrastructure for safe and efficient pilotage' — such as pilot boats, and office functions including billing. It promotes retention of pilots, by giving the pilots in the association some control over decisions that will affect the financial health of the pilots, the pilots’ association and other entities that may provide infrastructure support to the pilots.
Finally, to be very clear, the Coast Guard has no interest in whether Mr. Menkes joins the SLSPA or any other pilots’ association. That is a .matter entirely up to him and to the pilots’ association if he wants to apply for membership. Additionally, it is not the position of the Coast Guard that Mr. Menkes must join a pilots’ association if he wants to provide pilotage service. The Coast Guard agrees with Mr. Menkes that under the applicable statutes and regulations the certificated pilots’ associations may dispatch non-member pilots who are registered, licensed and qualified to provide pilotage service. However, the Coast Guard does not agree that the certificated pilots’ associations have to dispatch non-member pilots. The certificated pilots’ associations are primarily responsible for operation of the pilotage pool, and they may decide whether or not to dispatch non-member pilots.
Agency Decision on Remand from the Court of Appeals for the District of Columbia and the District Court for the District of Columbia in the Case of Richard J. Menkes v. Dep’t of Homeland Sec., et al. (June 2, 2008) at 8-16, reprinted in J.A. 286-94.