# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 5, 2012          Decided June 12, 2012

No. 11-5010

KENNETH R. FOX,
APPELLANT

v.

HILLARY RODHAM CLINTON, SECRETARY OF STATE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00553)

*Jack L. B. Gohn* argued the cause and filed the briefs for appellant.

*Bradley B. Banias*, Trial Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Tony West*, Assistant Attorney General. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

EDWARDS, *Senior Circuit Judge*: Dr. Kenneth Fox ("Appellant") – a Jewish American by birth who has lived in Israel as an Israeli national for over a decade – seeks a Certificate of Loss of Nationality ("a CLN") from the Department of State ("the Department" or "the agency"). He claims to be entitled to a CLN under two provisions of the Immigration and Nationality Act of 1952 ("the INA" or "the Act"). *See* Pub. L. No. 414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101 *et seq.* (2006)). First, he claims that under Section 349(a)(1) ("Section 1") of the INA, he intentionally surrendered his U.S. nationality by "obtaining naturalization in a foreign state," Israel, "upon his own application . . ., after having attained the age of eighteen years." 8 U.S.C. § 1481(a)(1). Second, he claims that under Section 349(a)(2) ("Section 2") of the INA, he intentionally relinquished his U.S. nationality by "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state," again, Israel, "after having attained the age of eighteen years." *Id.* § 1481(a)(2).

By a representative, Appellant first submitted a request for a CLN to the State Department in 2009. The Department denied the request, however, claiming that Appellant's acts did not satisfy the INA's requirements. With respect to Section 1 of the INA, the Department noted that, under Israeli law, Appellant had obtained Israeli nationality "by return," rather than "by naturalisation." Nationality Law, 5712–1952, 6 LSI 50, § 1 (1951–1952); *see also id.* §§ 2, 5. This was determinative, according to the agency, because, in the Department's view, the conferral of Israeli nationality "by naturalisation" occurs "upon . . . application," as the INA requires, whereas the conferral of nationality "by return" occurs merely by automatic operation of law – *i.e.*, not upon application. With respect to Section 2 of the INA, the Department found that there was insufficient evidence that Appellant had sworn a meaningful oath of allegiance to Israel.

Appellant appealed the agency's denial through informal administrative procedures to no avail. He then filed this suit challenging the Department's final decision, contained in a letter issued on March 8, 2010. *See* Letter from Edward A. Betancourt, Dir., Office of Policy Review and Interagency Liaison, Bureau of Consular Affairs, to Jack. L. B. Gohn, Esq. (March 8, 2010) ("Betancourt Letter"), *reprinted in* App. 139. Appellant's complaint invoked the District Court's jurisdiction under 28 U.S.C. § 1331. The District Court assumed that the complaint stated a cause of action under the Administrative Procedure Act ("the APA"), 5 U.S.C. § 501 *et seq.* (2006). *See Fox v. Clinton*, 751 F. Supp. 2d 122, 127 & n.3 (D.D.C. 2010) (citing 5 U.S.C. §§ 702, 704, 706). The Department filed a motion to dismiss, which the District Court granted. *See id.* at 131. Appellant then appealed the District Court's decision to this court.

We affirm the District Court's judgment only insofar as it upholds the Department's decision that Appellant is not eligible for a CLN under Section 2 of the INA. We reverse and remand, however, the District Court's judgment dismissing Appellant's challenge to the Department decision denying his request for a CLN under Section 1. The agency's statutory interpretation of Section 1 of the INA, as rendered in the Betancourt Letter, is not entitled to *Chevron* deference. And, because the Department failed to provide any coherent explanation for its decision regarding the applicability of Section 1, the agency's action was arbitrary and capricious for want of reasoned decisionmaking. We reverse the judgment of the District Court on these points and remand with instructions to remand the case to the Department for reconsideration of Appellant's request for a CLN pursuant to Section 1 of the INA.

## I. Background

### A. The Statutory Framework

#### 1. *The INA*

The INA states that "[a] person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing" any designated expatriating act "with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a). Appellant claims to have performed two such expatriating acts:

> (1) obtaining naturalization in a foreign state upon his own application or upon an application filed by a duly authorized agent, after having attained the age of eighteen years; or

> (2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof, after having attained the age of eighteen years . . . .

*Id.*

> The INA defines "naturalization" as

> the conferring of nationality of a state upon a person after birth, *by any means whatsoever*.

*Id.* § 1101(a)(23) (emphasis added). This definition obviously controls the meaning of "naturalization" under Section 1 of the INA.

Congress adopted the "intention of relinquishing United States nationality" requirement in 1986. *See* Immigration and Nationality Act Amendments of 1986, Pub. L. No. 99-653, § 18, 100 Stat. 3655, 3658. Even prior to the 1986 amendments to the INA, however, the law was clear that an American citizen could not lose his or her nationality absent a showing that he or she

committed an "expatriating act" with a specific "intent to terminate United States citizenship." *Vance v. Terrazas*, 444 U.S. 252, 263 (1980); *see also Afroyim v. Rusk*, 387 U.S. 253, 267–68 (1967).

Finally, the Act provides that "[w]henever the loss of United States nationality is put in issue in any action or proceeding . . . the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence." 8 U.S.C. § 1481(b). The Act also establishes a rebuttable presumption that a person who commits an expatriating act does so voluntarily. *See id.*

### 2. *Israel's Nationality Law and Law of Return*

Israel's Nationality Law sets forth the procedures that immigrants must follow to obtain Israeli nationality. That law, as amended, states:

Israel nationality is acquired –

by return (section 2),

by residence in Israel (section 3),

by birth (section 4)[,]

by birth and residence in Israel (section 4A)[,]

by naturalisation (sections 5 to 8) or

by grant (section 9).

There shall be no Israel nationality save under this Law.

Nationality Law, 5712–1952, 6 LSI 50, § 1, *as amended by* Nationality (Amendment No. 2) Law, 5728–1968, § 1; *see* Addendum. The dispute in this case is focused on nationality acquired "by return" or "by naturalisation" under Israel's Nationality Law.

### *Nationality "by Return"*

Section 2 of Israel's Nationality Law describes the requirements for obtaining Israeli nationality "by return." The relevant portions of Section 2, as amended, read as follows:

(a) Every *'oleh* under the Law of Return shall become an Israel national.

(b) Israel nationality by return is acquired–

. . .

(2) by a person having come to Israel as an *'oleh* after the establishment of the State – with effect from the day of his *'aliyah*;

. . .

(4) by a person who has received an *'oleh*'s certificate under section 3 of the Law of Return – with effect from the day of the issue of the certificate.

(c) This section does not apply –

. . .

(2) to a person of full age who immediately before the day of his *aliyah* or immediately before the day of the issue of his *oleh's* certificate was a foreign national and who, on or before that day or within three months thereafter and while still a foreign national declares that he does not wish to become an Israel national . . . .

Nationality Law, 5712–1952, 6 LSI 50, § 2 (footnotes omitted) (citations omitted), *as amended by* Nationality (Amendment No. 2) Law, 5728–1968, § 2; *see* Addendum. "'[O]leh* and *'aliyah* mean respectively a Jew immigrating, and the immigration of a Jew, into the Land of Israel." Nationality Law, 5712–1952, 6 LSI 50, Translator's Note.

The Law of Return, which, as noted above, is expressly incorporated by the Nationality Law, reads, in relevant part, as follows:

1. Every Jew has the right to come to this country as an *oleh*.

2. (a) *Aliyah* shall be by *oleh*'s visa.

 (b) An *oleh*'s visa shall be granted to every Jew who has expressed his desire to settle in Israel, unless the Minister of the Interior is satisfied that the applicant

 (1) is engaged in an activity directed against the Jewish people; or

 (2) is likely to endanger public health or the security of the State; or

 (3) is a person with a criminal past, likely to endanger public welfare.

3. (a) A Jew who has come to Israel and subsequent to his arrival has expressed his desire to settle in Israel may, while still in Israel, receive an *oleh*'s certificate.

 (b) The restrictions specified in section 2(b) shall apply also to the grant of an *oleh*'s certificate, but a person shall not be regarded as endangering public health on account of an illness contracted after his arrival in Israel.

Law of Return, 5710–1950, 4 LSI 114, §§ 1–3, (1949–1950) (footnote omitted), *as amended by* Law of Return (Amendment 5714–1954); *see* Addendum.

It is plain from the foregoing provisions that nationality "by return" in Israel turns on the requirements of Israel's Law of Return. The Nationality Law and the Law of Return are expressly integrated to make this point obvious. Thus, for

example, Section 2(b)(2) of the Nationality Law corresponds to section 2 of the Law of Return, the latter of which states that a Jew may enter Israel as an *oleh*, on an *oleh*'s visa. *See* Law of Return, 5710–1950, 4 LSI 114, § 2(a). And section 2(b)(4) of the Nationality Law corresponds to section 3 of the Law of Return, the latter of which states that a Jew who otherwise enters Israel may apply for an *oleh*'s certificate. *See id.* § 3(a).

It is also noteworthy that, under the Law of Return, Israel's Minister of the Interior may deny applications for either an *oleh*'s visa or an *oleh*'s certificate upon finding the applicant "(1) is engaged in an activity directed against the Jewish people; or (2) is likely to endanger public health or the security of the State; or (3) is a person with a criminal past, likely to endanger public welfare." *Id.* §§ 2(b), 3(b), *as amended by* Law of Return (Amendment 5714–1954); *see* Addendum. In other words, conferral of nationality "by return" is secured pursuant to application, not by automatic operation of law.

### *Nationality "by Naturalisation"*

Section 5 of Israel's Nationality Law addresses the requirements for an individual to obtain nationality "by naturalisation." The law states:

(a) A person of full age, not being an Israel national, may obtain Israel nationality by naturalisation if –

(1) he is in Israel; and

(2) he has been in Israel for three years out of five years preceding the day of the submission of his application; and

(3) he is entitled to reside in Israel permanently; and

(4) he has settled, or intends to settle, in Israel; and

(5) he has some knowledge of the Hebrew language; and

(6) he has renounced his prior nationality or has proved that he will cease to be a foreign national upon becoming an Israel national.

(b) Where a person has applied for naturalisation, and he meets the requirements of subsection (a), the Minister of the Interior, if he thinks fit to do so, shall grant him Israel nationality by the issue of a certificate of naturalisation.

(c) Prior to the grant of nationality, the applicant shall make the following declaration:

"I declare that I will be a loyal national of the State of Israel."

(d) Nationality is acquired on the day of the declaration.

Nationality Law, 5712–1952, 6 LSI 51, § 5.

## B. Facts and Procedural History

Appellant is a U.S. citizen by birth. He traveled to Israel from Cyprus on a visitor's, non-*oleh*'s visa in October 2001. Appellant's Br. at 3–4, 11; Gov't's Br. at 1. Shortly thereafter, he submitted an "Application for Permit of Permanent Residence in Israel." *See* Application for Permit of Permanent Residence in Israel, App. 113. On that form, Appellant checked off a box to indicate his intention to seek a "Certificate of 'oleh'" under the Law of Return. *See id.* The record is somewhat unclear on the sequence of events that followed. Appellant claims that he never actually received an *oleh*'s certificate from Israel. *See* Appellant's Br. at 11–12; Appellant's Reply Br. at 13–14. But it is undisputed that Appellant did obtain Israeli nationality on January 30, 2002, when Israel issued him a citizenship card. *See* App. 114 (photocopy of Appellant's citizenship card submitted to State Department). Moreover, in 2010, at Appellant's request, Israel also issued a certificate attesting to his Israeli citizenship. *See* Certificate Attesting Israeli Citizenship (Feb. 3, 2010)

("Citizenship Certificate"), App. 138. That certificate indicates that, so far as Israel is concerned, Appellant obtained Israeli nationality in 2002, "[a]ccording to paragraph 2(B)(4)" of the Nationality Law, *id.* – the provision governing the conferral of nationality "by return" via an *oleh*'s certificate.

On July 8, 2009, an attorney, Erin Green, contacted the Department requesting a CLN on Appellant's behalf under Section 1 and/or 2 of the INA. *See* Letter from Erin Green, Esq. to Dir., Office of Policy Review and Interagency Liaison (July 8, 2009), App. 28. In the letter, Green explained that Appellant had obtained nationality from Israel in 2002; that he "ha[d] not lived in the United States since 1996"; that he "ha[d] not been in the United States since 1997"; that he "ha[d] not travelled [sic] on a United States passport since 1999"; that he "[was] not currently in possession of a United States passport"; that he "ha[d] not voted in the United States since 1992"; that he "ha[d] regularly voted [in] Israel since he became a citizen"; and that he "ha[d] not had any business ties to the United States since 1996." *Id.*, App. 29–30. Attached to the letter was a notarized affidavit from Appellant indicating that by seeking Israeli nationality in 2002, he had intended to renounce his U.S. nationality. *See* Fox Aff. of Renunciation of U.S. Citizenship, July 7, 2009, App. 31. Kim Richter replied on behalf of the State Department and, over the course of a brief correspondence, denied Appellant's request. *See, e.g.*, E-mail from Kim B. Richter to Erin Green (Aug. 6, 2009), App. 39; E-mail from Kim B. Richter to Erin Green (Aug. 5, 2009), App. 34; E-mail from Kim B. Richter to info@ktalegal.com (July 21, 2009), App. 32.

In September 2009, Jack Gohn, Appellant's counsel before this court, contacted Edward Betancourt, the Director of the Office of Policy Review and Interagency Liaison at the Department. *See* Letter from Jack L. B. Gohn to Edward A. Betancourt (Sept. 8, 2009), App. 40. Gohn conveyed Appellant's interest in appealing the Department's decision and

requested information regarding the procedures for filing such an appeal. *See id.*, App. 40. The Department had previously eliminated the Board of Appellate Review – the subagency body that had been responsible for reviewing CLN decisions – in favor of "alternative, less cumbersome review of loss of nationality determinations by the Bureau of Consular Affairs." Department of State, Board of Appellate Review; Review of Loss of Nationality, Final Rule, 73 Fed. Reg. 62,196, 62,196 (Oct. 20, 2008). And Betancourt replied that, under the new system, his office possessed final discretion to review the agency's denial of Appellant's CLN request. *See* Letter from Edward A. Betancourt to Jack L. B. Gohn (Nov. 2, 2009), App. 58.

Gohn filed an informal appeal of the agency's denial on November 10, 2009. *See* Letter from Jack L. B. Gohn to Edward A. Betancourt (Nov. 10, 2009), App. 65–69. With respect to Section 1, Gohn stated that Appellant had obtained nationality by submitting an application for citizenship "under Section 3 of the Law of Return." *Id.*, App. 65. Gohn argued that Appellant was accordingly entitled to a CLN, because "the elements for loss of citizenship under INA Section 1 are all present: (a) intent; (b) naturalization; (c) application; and (d) age." *Id.*, App. 66. And with respect to Section 2 of the INA, Gohn explained that Appellant had recited the precise oath of allegiance that Israel requires from persons seeking Israeli nationality "by naturalisation" under the Nationality Law. *See id.*, App. 68. Gohn admitted that Appellant had not obtained nationality under that provision. But Gohn explained that "as the only form of declaration contemplated by Israeli naturalization law," Appellant's oath was nonetheless "the appropriate and approved form of oath or declaration of allegiance to Israel, and hence an appropriate form of declaration within the meaning of INA Section 2." *Id.*, App. 68.

Betancourt replied on December 4, 2009, requesting

information relevant to Appellant's claim under Section 1 of the INA. Specifically, Betancourt asked for "[a] certified copy of the application for Israeli citizenship that Dr. Fox submitted on October 25, 2001, . . . [a] certified copy of Mr. Fox's Israeli citizenship certificate[,] . . . [and c]ertified copies of all the pages of [Fox's U.S.] passport." Letter from Edward A. Betancourt to Jack L. B. Gohn (Dec. 4, 2009), App. 109. In reply, Gohn submitted the following materials: the first page of the requested application, a copy of Appellant's Israeli nationality card (Gohn subsequently also submitted a copy of Appellant's Citizenship Certificate), a copy of Appellant's Israeli passport, and a copy of Appellant's U.S. passport. *See* Letter from Jack L. B. Gohn to Edward A. Betancourt (Dec. 15, 2009), App. 110–27. Betancourt then requested that Gohn submit a "certified copy of the signed oath of allegiance to the state of Israel that Mr. Fox is alleged to have taken." Letter from Edward A. Betancourt to Jack L. B. Gohn (Jan. 21, 2010), App. 128. Gohn replied in relevant part that Betancourt was requesting a document "that does not exist, and is not required. The taking of the oath was an oral act, not a written one." Letter from Jack L. B. Gohn to Edward A. Betancourt (Feb. 22, 2010), App. 130.

On March 8, 2010, Betancourt issued what both parties agree is the agency's final decision in this case. The Betancourt Letter states:

> The Department of State cannot issue Mr. Fox a [CLN] on the basis of Section 349(a)(1) of the [INA] due simply to the fact that he has heretofore not demonstrated that he has naturalized as a citizen of a foreign state "upon his own application . . . ." The evidence presented to date only establishes that Mr. Fox applied for permanent residence in Israel. The statute is unambiguous in requiring the U.S. citizen to apply for naturalization in order to fall within the purview of this section of the law.

While you are correct in asserting that Section 349(a)(2) of the INA does not require the oath of allegiance to be in writing, we do require evidence that is both objective and independent that a meaningful oath of allegiance has been taken. The oath that you allege that Mr. Fox has orally taken is administered to individuals who naturalize as Israeli citizens pursuant to paragraph five of the Israeli Citizenship Law of 1952. The Israeli citizenship certificate issued to your client clearly indicates that he acquired citizenship in accordance with paragraph 2. Citizenship acquired in accordance with this section of the law does not appear to require the taking of an oath of allegiance.

Betancourt Letter, App. 139 (third alteration in original).

Appellant filed suit in the District Court, effectively seeking "declaratory and mandamus relief requiring the Department of State to recognize his expatriating acts and thereby issue him a Certificate of Loss of Nationality." *Fox*, 751 F. Supp. 2d at 127. The District Court exercised subject matter jurisdiction over Appellant's complaint under 28 U.S.C. § 1331, and assumed that the complaint stated a cause of action under the APA, *see Fox*, 751 F. Supp. 2d at 127 & n.3 (citing 5 U.S.C. §§ 702, 704, 706(2)(A)). After reviewing the parties' submissions, the District Court found that the Department's "decisions were not arbitrary, capricious, an abuse of discretion, or otherwise unlawful," held that Appellant's "complaint fails to state a claim upon which relief can be granted," and granted the Department's motion to dismiss. *Id.* at 131. Appellant filed a timely appeal seeking to overturn the judgment of the District Court.

## II.    Analysis

### A.    Standard of Review

"In a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) (citations omitted). In other words, we "do not defer to a district court's review of an agency adjudication any more than the Supreme Court defers to a court of appeals' review of such a decision." *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991) (citation omitted).

Two distinct but potentially overlapping standards of APA review govern the instant dispute. *First*, the APA requires that agency actions not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court amplified the standard for arbitrary and capricious review in *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). The Court explained:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43.

To survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking. *See, e.g.*, *Coburn v. McHugh*, --- F.3d ---, No. 10-5350, 2012 WL 1889324, at *5, 10–11 (D.C. Cir. May 25, 2012); *Siegel v. SEC*, 592 F.3d 147, 158–64 (D.C. Cir. 2010); *Tripoli Rocketry Ass'n,*

*Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006).  Thus, even though arbitrary and capricious review is fundamentally deferential – especially with respect to "matters relating to [an agency's] areas of technical expertise," *Tripoli*, 437 F.3d at 77 – "no deference" is owed to an agency action that is based on an agency's "purported expertise" where the agency's explanation for its action "lacks any coherence," *id.*  As we explained in *Tripoli*,

> [t]his court routinely defers to administrative agencies on matters relating to their areas of technical expertise.  We do not, however, simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment.  In order to survive judicial review in a case arising under § 7006(2)(A) [sic], an agency action must be supported by "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)).  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce." *Id*.

437 F.3d at 77 (parallel citations omitted).

The requirement of reasoned decisionmaking indisputably applies in situations involving judicial review of agency adjudicatory actions.  *See, e.g.*, *Allentown Mack Sales & Serv., Inc.*, 522 U.S. at 375 (noting that "[r]easoned decisionmaking . . . promotes sound results, and unreasoned decisionmaking the opposite").  We will not uphold an agency adjudication where the agency's "judgment . . . was neither adequately explained in its decision nor supported by agency

precedent." *Siegel*, 592 F.3d at 164; *see also Coburn*, 2012 WL 1889324, at \*2 (holding that because the agency decisions were "largely incomprehensible," they were "unworthy of any deference"); *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 167 (D.C. Cir. 2005) (vacating an agency decision due to "a lapse of reasonable and fair decisionmaking"). Thus, our review of the Betancourt Letter – the agency's final judgment in its informal adjudication of Appellant's claims – requires us to assess whether the Department's rejection of Appellant's request for a CLN was based on reasoned decisionmaking.

*Second*, Appellant's claims also require us to consider whether we are obliged to defer to the Department's interpretations of the INA, as expressed in the Betancourt Letter. The parties disagree sharply over what level of deference is due to the agency's interpretations. "Although balancing the necessary respect for an agency's knowledge, expertise, and constitutional office with the courts' role as interpreter of laws can be a delicate matter, familiar principles guide us." *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006).

As a general matter, an agency's interpretation of the statute which that agency administers is entitled to *Chevron* deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* framework, a court reviewing such an interpretation follows two familiar steps:

> Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the reviewing court proceeds to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary

to the statute." *Chevron*, 467 U.S. at 843–44.

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 141 (2007) (alterations in original).

We owe no deference to the Department's interpretation of its own regulations covering applications for CLNs, because there are no agency regulations at issue in this case. *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51 (1991) (holding that when "the meaning of [regulatory] language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations" (alteration in original) (citations omitted) (internal quotation marks omitted)). This case involves nothing more than the agency's interpretation and application of the INA in an informal adjudication.

It is clear that "not all statutory interpretations by agencies qualify for [*Chevron*] deference." *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659 (D.C. Cir. 2003) (citations omitted). The Supreme Court has clarified that "[d]eference in accordance with *Chevron* . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales*, 546 U.S. at 255–56 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). However, to hold that an agency decision "do[es] not fall within *Chevron* is not . . . to place [it] outside the pale of any deference whatever." *Mead*, 533 U.S. at 234. Instead, an agency action that is not entitled to *Chevron* deference "is 'entitled to respect' only to the extent it has the 'power to persuade.'" *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Mead*, 533 U.S.

at 234–35; *Pub. Citizen, Inc.*, 332 F.3d at 661–62.

With these principles in mind, we turn to the Department's decision denying Appellant's request for a CLN.

**B.   Section 1 of the INA**

Appellant claims that he committed an expatriating act under Section 1 of the INA by "obtaining naturalization in a foreign state upon his own application . . ., after having attained the age of eighteen years."   8 U.S.C. § 1481(a)(1).   The Department rejected Appellant's claim based on its interpretation of Section 1 of the INA.  The Department found that Appellant had not "demonstrated that he [had] naturalized as a citizen of a foreign state '*upon his own application*.'" Betancourt Letter (emphasis added), App. 139.   In the Department's view, this was fatal to Appellant's request for a CLN, because the INA "is *unambiguous* in requiring the U.S. citizen to *apply for naturalization* in order to fall within the purview of [Section 1] of the law."  *Id*. (emphasis added).  On the record before us, the Department's position is difficult to fathom.

### *The Bottom Line*

Our judgment regarding the Department's rejection of Appellant's Section 1 claim is straightforward. First, the agency's statutory interpretation of Section 1 of the INA, as rendered in the Betancourt Letter, is not entitled to *Chevron* deference.  Second, the agency's denial of Appellant's request for a CLN is not based on reasoned decisionmaking.   And, finally, even if the agency proceeding and the Betancourt Letter purported to render a judgment carrying the "force of law," *Mead*, 533 U.S. at 227, warranting *Chevron* deference, the Department's action would still fail for want of reasoned decisionmaking, *see Pub. Citizen, Inc.*, 332 F.3d at 661 (holding that "even if we were prepared to accord *Chevron* deference to the [agency's interpretation of the statute expressed in its

manual], that document contains no interpretation of [the statute] to which we might defer"). We will now explain.

### *The Department's Betancourt Letter Is Not Entitled to* Chevron *Deference*

In *Christensen v. Harris County*, 529 U.S. 576 (2000), the Supreme Court warned that agency "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference," *id.* at 587 (citations omitted). The Supreme Court later clarified, however, that "the fact that [an] Agency . . . [reaches] its interpretation through means less formal than 'notice and comment' rulemaking, *see* 5 U.S.C. § 553, does not automatically deprive that interpretation of the judicial deference otherwise its due." *Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (citations omitted). Rather, "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time [may] indicate that *Chevron* provides the appropriate legal lens through which to view the legality of [a disputed] Agency interpretation" of its authorizing statute. *Id*. at 222 (citations omitted).

Indeed, this court's decisions in *Menkes v. U.S. Department of Homeland Security*, 637 F.3d 319 (D.C. Cir. 2011), and *Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004), underscore the point that agency interpretations reached in situations other than notice-and-comment rulemaking and formal adjudications under the APA may nonetheless qualify for *Chevron* deference. But *Barnhart*, *Menkes*, and *Mylan* are easily distinguishable from the instant case.

In *Barnhart*, the Court deferred to an agency's published

interpretations of an ambiguous, interstitial statute and the agency's own regulations – which regulations had been promulgated pursuant to an express delegation of rulemaking authority. *See* 535 U.S. at 217, 218–19, 222. In *Menkes*, we deferred to an agency's interpretation that was offered in an "exhaustive [adjudicative] decision," in which the agency "addressed the issues raised by this court [in remanding the case] and by Menkes's counsel in his submission on remand." 637 F.3d at 326. Moreover, we noted that the agency "was acting pursuant to an express delegation from Congress"; that the agency was addressing "precisely the sort of complex, interstitial questions that the [agency] deserves deference to address"; and that the agency's judgment "reflect[ed] a longstanding agency policy." *Id.* at 331–32 (citation omitted). And in *Mylan Laboratories*, this court afforded *Chevron* deference to two letters issued by the Food and Drug Administration ("the FDA") to private disputants. But the decision in *Mylan Laboratories* rests explicitly on the same factors recited by the Court in *Barnhart*. *See Mylan Labs., Inc.*, 389 F.3d at 1279–80. This court cited "the complexity of the statutory regime under which the [agency] operate[d]," the agency's "expertise," the "careful craft of the scheme it devised to reconcile the various statutory provisions," and the fact that the agency's "decision made no great legal leap but relied in large part on its previous determination of the same or similar issues and on its own regulations." *Id*. at 1280 (citations omitted).

In short, in *Barnhart*, *Menkes*, and *Mylan Laboratories*, the reviewing courts deferred to agency interpretations of statutes within their domains of delegated authority, because the challenged interpretations satisfied the factors laid out in *Barnhart*; and the agency interpretations were clearly intended to have general applicability and the force of law. The resulting actions were thus easily subject to meaningful judicial scrutiny, because the agency decisions were thoroughly explained.

We cannot say the same of the Betancourt Letter, particularly because there is nothing in it to give deference to. Indeed, in some ways, it is even less deserving of *Chevron* deference than was the opinion letter at issue in *Christensen*. In *Christensen*, at least, the challenged letter offered the issuing agency's general policy position with respect to a provision of the Fair Labor Standards Act, with supporting references to corresponding regulations. *See* Opinion Letter from Karen R. Keesling, Acting Adm'r, Dep't of Labor (Sept. 14, 1992), 1992 WL 845100. Here, by contrast, the Department offered little more than uncited, conclusory assertions of law in a short, informal document that does not purport to set policy for future CLN determinations. *See* Betancourt Letter, App. 139. And the Betancourt Letter is premised on highly questionable assumptions about foreign law, *i.e.*, Israel's Nationality Law and Law of Return, with respect to which the agency is owed no deference.

### *The Betancourt Letter Is Entirely Unpersuasive*

The Betancourt Letter states that Appellant's naturalization did not satisfy the requirements of Section 1. But this conclusion appears to be based on an unpersuasive view of the requirements of the INA, some seemingly faulty assumptions about the requirements of Israeli law, and possible misunderstandings of the material facts in this case.

There can be no doubt that Appellant "obtain[ed] naturalization" in Israel, as required by Section 1 of the INA, 8 U.S.C. § 1481(a)(1). *See* Citizenship Certificate, App. 138; App. 114 (photocopy of Appellant's Israeli citizenship card). And the Department does not doubt that Appellant performed this act with the necessary "intention of relinquishing United States nationality," 8 U.S.C. § 1481(a). Instead, the Department based its rejection on the supposedly "unambiguous" meaning of the phrase "upon his own application" in the INA, 8 U.S.C. § 1481(a)(1). *See* Betancourt Letter, App. 139. According to

the Department, the conferral of Israeli nationality "by naturalisation" occurs "upon . . . application," as the INA requires, whereas the conferral of nationality "by return" occurs merely by automatic operation of law, not upon application. Therefore, in the Department's view, Appellant did not obtain naturalization upon application, because he obtained Israeli citizenship merely by operation of law after receiving his *oleh*'s certificate. This conclusion is a non sequitur.

The INA is not, as the Department claims, *unambiguous* on the matters in dispute. The first obvious flaw in the Betancourt Letter is that it fails to comprehend that the INA defines "naturalization" as "the conferring of nationality of a state upon a person after birth, *by any means whatsoever*." 8 U.S.C. § 1101(a)(23) (emphasis added). As we have noted, there is some dispute as to how Appellant obtained his Israeli nationality. The Department contends – and we are inclined to agree, given the evidence in the record – that Appellant applied for an *oleh*'s certificate and became a citizen shortly after that certificate's issuance. Appellant counters that he never received an *oleh*'s certificate and that the common practice in Israel is to treat an application for permanent residence as an application for citizenship. But the difference is immaterial: The INA does not unambiguously foreclose Appellant's loss of nationality under either interpretation of events. In either case, Appellant filed an "application" that resulted in his "obtaining naturalization"; the Israeli Minister of the Interior had discretion to deny that application, *see* Law of Return, 5710–1950, 4 LSI 114, §§ 2(b), 3(b), *as amended by* Law of Return (Amendment 5714–1954); *see* Addendum; and Appellant's citizenship was conferred "upon" his application.

The Department's statutory argument that Appellant was obliged to obtain citizenship in Israel "by naturalisation" and not "by return" is perplexing given the INA's express, expansive definition of "naturalization" noted above. As noted, the statute

says that "'naturalization' means the conferring of nationality of a state upon a person after birth, *by any means whatsoever*." 8 U.S.C. § 1101(a)(23) (emphasis added). How then can it matter whether Appellant applied for Israeli nationality "by naturalisation" or "by return"? The Department's interpretation would make some sense only if it were right that a person obtains Israeli nationality "by return" without submitting an application. But that is not what happened in this case. Indeed, the Department has conceded that Appellant obtained Israeli nationality only after he *applied for* an *oleh*'s certificate. His *oleh*'s certificate – which led to Israeli citizenship – was obtained only after his application was accepted. Likewise, an Israeli citizenship card was issued to Appellant only after he had applied for it. Appellant's mere presence in Israel was not how he obtained citizenship.

At oral argument, counsel for the Department argued that the agency's interpretation is reasonable, because it prevents dual–U.S. Israeli citizens from losing their American citizenship inadvertently. But the Department did not offer this explanation in the Betancourt Letter. Nor did Department's counsel explain why this alleged risk exists, given the INA's requirement that the act of "obtaining naturalization . . . upon . . . application" must be made with the specific expatriating intent to result in a loss of U.S. citizenship. 8 U.S.C. § 1481(a)(1); *Vance*, 444 U.S. at 258–63.

The Department's counsel also suggested at oral argument that there is an unbroken string of decisions from the Board of Appellate Review supporting its interpretation of Section 1 of the INA. But unlike either the Department of Labor in *Christensen* or the FDA in *Mylan Laboratories*, the Department here did not explain or cite such purportedly controlling authority in its Betancourt Letter. It also failed to cite any such decisions in its briefs to the District Court and to this court. And Department's counsel could not say whether these alleged

decisions were issued prior to Congress's adoption of the "intent" requirement in 1986, or whether any of them involved a U.S. citizen's seeking to *obtain* a CLN, rather than a citizen's trying to *prevent* a loss of nationality.

In sum, because the INA is not unambiguous on these matters, and because the Betancourt Letter is unpersuasive in addressing Appellant's claim for a CLN under Section 1, the Department can claim no deference for its interpretation of Section 1 under either *Chevron* step two or *Skidmore*.

### *The Judgment Reached in the Betancourt Letter Is Neither Logical Nor Rational*

The same flaws that lead us to conclude that the Betancourt Letter lacks the power to persuade also demonstrate that the process by which the agency reached its judgment was neither "logical" nor "rational." *Tripoli Rocketry Ass'n, Inc.*, 437 F.3d at 77 (citation omitted) (internal quotation marks omitted). As we have explained,"the [Department's] judgment" denying Appellant's CLN request under Section 1 of the INA, *as expressed in the Betancourt Letter*, "was neither adequately explained . . . nor supported by agency precedent." *Siegel*, 592 F.3d at 164. We therefore find that judgment to be arbitrary and capricious for want of reasoned decisionmaking. *See id.*

### *The Appropriate Remedy*

For the reasons indicated above, the Betancourt Letter obviously does not merit *Chevron* deference. And, following *Skidmore*, we find that the letter's persuasive power is virtually nil. We also conclude that the agency's decision is arbitrary and capricious for want of reasoned decisionmaking. In this situation, we might hold that Department's interpretation of Section 1 is "contrary to law" and order the issuance of a CLN pursuant to Section 1 of the INA. *Pub. Citizen, Inc.*, 332 F.3d at 671; *see also* EDWARDS & ELLIOTT 161 ("When the *Skidmore* standard controls, the final judgment on the legality of any

contested administrative action rests with the court." (citation omitted)). This is the relief that Appellant seeks, and his position is intuitively appealing.

We recognize, however, that in the field of immigration generally, and expatriation more specifically, there may be sensitive issues lurking that are beyond the ken of the court. The Department, not the court, has the authority, discretion, and presumed expertise to act in the first instance to address matters within its domain of authority under the INA, subject of course to appropriate judicial review. We will therefore pursue a course of prudence, following the path taken by the court in *Coburn*, *Tripoli*, and *Siegel*, and remand the case to the District Court with instructions to remand the case to the Department for reconsideration of Appellant's Section 1 claim.

## C. Section 2 of the INA

Appellant separately claims that he lost his U.S. nationality by "taking an oath or making an affirmation or other formal declaration of allegiance to" Israel. 8 U.S.C. § 1481(a)(2). Appellant admits that, given his choice to obtain nationality "by return" rather than "by naturalisation," Israel did not require him to swear any oath of allegiance. But he argues that he is entitled to a CLN nonetheless, because he voluntarily took *two* oaths of allegiance, one of which was identical in substance to the declaration that would have been required of him had he chosen to obtain nationality "by naturalisation." *See* Nationality Law, 5712–1952, 6 LSI 51, § 5(c).

The Department offered two grounds for rejecting Appellant's request. *First*, the Department explained that its policy is to require "objective and independent" evidence that an oath has actually taken place. Betancourt Letter, App. 139. This explanation is completely consistent with the INA's requirement that the party seeking to establish expatriation must do so by the preponderance of the evidence. *See* 8 U.S.C. §

1481(b). And the requirement of "objective and independent" evidence imposes no significant burden on citizens, like Appellant, seeking to expatriate. The Department expressly does not require an expatriating oath to be in writing or to take any particular form. *See* U.S. DEPARTMENT OF STATE, 7 FOREIGN AFFAIRS MANUAL – CONSULAR AFFAIRS 1252(e); *see* Addendum. Hence, in most situations, the Department's requirement for objective evidence should be easy to satisfy. In a future case, if the Department applies the requirement in a burdensome or otherwise unfair way, that application would be subject to judicial review under the arbitrary and capricious standard.

Here, however, it is manifestly clear that Appellant failed to satisfy the Department's requirement. Before this court, Appellant's counsel asserted that Appellant took an oath of allegiance to Israel on two separate occasions. Appellant purportedly took the "first" oath when he naturalized in 2002, and he apparently parroted the terms of Israel's official oath of allegiance. *See* Appellant's Br. at 4–6, 25. But there is nothing in the record to substantiate that this oath ever took place. Appellant's counsel's assertions regarding this oath are consistently uncited. And at oral argument, counsel directed us to a single bullet point in Appellant's initial request for a CLN, which states that Appellant "t[ook] the required oath to become an Israeli citizen." Letter from Erin Green to Director (July 8, 2009), App. 28. The Department did not err in concluding that this assertion by Appellant's representative rather than Appellant himself was not sufficient evidence that Appellant had sworn an oath as required by Section 2 of the INA.

Appellant also asserts that he made an oath "in wording of his own," Appellant's Br. at 25, at some point in 2009, *see id.* at 6. Appellant's counsel's description of this "second" oath has not been precise or consistent. At times, counsel appears to claim that Appellant actually took this oath within or via one of

the two affidavits that Appellant submitted to the Department in 2009. *See* Appellant's Br. at 12 ("Mr. Fox . . . had supplied a signed oath of allegiance to Israel over his signature in 2009."); *id.* at 25 ("The second time Mr. Fox took an oath, he did so in wording of his own." (citing Fox Aff. of Renunciation of U.S. Citizenship, July 7, 2009, App. 31.)). At other times, counsel appears to claim that the affidavits instead substantiate that Appellant took an oath in 2002 or at some other point during his residency in Israel. *See* Letter from Jack L. B. Gohn to Edward A. Betancourt (Feb. 22, 2010) ("Mr. Fox has provided an affidavit to the effect that he took the oath, and that is the only documentation possible under the circumstances."), App. 130.

Upon review of the affidavits, however, it hardly matters. In his November 8, 2009 affidavit, Appellant neither specifically asserted that he had already taken an oath of allegiance to Israel nor offered such an oath. *See* Fox Aff., Nov. 8, 2009, App. 71–72. And in his July 7, 2009 affidavit, Appellant merely stated: "I would like to affirm that it has been *my express intent* to renounce my citizenship in 2002 coupled with the act of either becoming a citizen of another country, taking another country's oath, or a combination of the two." Fox Aff. of Renunciation of U.S. Citizenship, July 7, 2009 (emphasis added), App. 31. The affidavit does not state that Appellant had, at any point, actually taken an oath; when the oath had been taken; whether the oath had been observed by anyone; or what words Appellant had used. Hence, there is simply nothing in the record that qualifies as objective evidence demonstrating that Appellant swore an oath of allegiance to Israel.

*Second*, the Department explained in the Betancourt Letter that it could not accept Appellant's CLN request, because his oath was not sufficiently "meaningful," insofar as it had not been required by Israel. Betancourt Letter, App. 139. Appellant does not claim that his oath was required. Instead, he objects to the agency's policy of granting a CLN pursuant to Section 2

only to an individual who makes an oath that is required by the foreign state.

This court confronted whether an individual's taking an oath of allegiance to another country qualified as an expatriating act in the context of reviewing a treason conviction in *Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950). In that decision, this court identified several factors that compelled the conclusion that the making of the oath at issue had not been expatriating:

> There is no indication . . . that the paper which [the defendant] said she signed was intended as a renunciation of citizenship; there is no testimony whatever that it was sworn to before anyone authorized to administer an oath or indeed before anyone at all; its exact content is uncertain; if it be treated as an affirmation or declaration rather than an oath it is informal rather than formal in character; and there is no connection whatever shown between it and any regulation or procedure having to do with citizenship or attaching onself to the Reich or to Hitler. These circumstances preclude attributing to it the character of such an oath or affirmation or other formal declaration as the statute requires to bring about expatriation.

*Id.* at 983. The court went on favorably to describe a Board of Immigration Appeals' decision in which that entity had explained that "[a]n oath of allegiance has no real significance unless the oath be made to the state and accepted by the State. Such acceptance on the part of the State must be made in accordance with the laws of that State." *Id.* (citation omitted) (internal quotation marks omitted).

Appellant claims that the Department's policy is contrary to law, because it imposes a burden on the fundamental right of expatriation. *See Savorgnan v. United States*, 338 U.S. 491, 497–99 (1950) ("[T]he United States has supported the right of

expatriation as a natural and inherent right of all people. . . . [The INA's predecessor] Acts are to be read in the light of the declaration of policy favoring freedom of expatriation which stands unrepealed." (citations omitted)). According to Appellant, the effect of the Department's policy is to deny an avenue of expatriation to individuals who seek to obtain nationality from countries that do not require the swearing of an oath of allegiance.

We need not decide in this case whether the Department's requirement imposes an impermissible burden on the exercise of Appellant's right to expatriate. The first ground relied upon by the Department to reject Appellant's Section 2 claim – insufficient evidence – is enough to support the agency's judgment on this issue. As noted above, Appellant failed to show by a preponderance of the evidence that he took *any* oath that satisfied the requirements of Section 2. So there is nothing in the record that qualifies as objective evidence demonstrating that Appellant swore an oath of allegiance to Israel. Therefore, Appellant's failure of proof on this issue forecloses his claim under Section 2.

## D. Section 5 of the INA

The Department has consistently maintained that Appellant could, at his leisure, obtain a CLN by "making a formal renunciation of nationality before a diplomatic or consular officer of the United States." 8 U.S.C. § 1481(a)(5) ("Section 5"). Given our disposition, we find it unnecessary to address Appellant's claims that he cannot request a CLN under Section 5 or to speculate as to why he did not seek a CLN under this provision in the first place.

We do note, however, that it is immaterial here whether Appellant could receive a CLN under Section 5. There is nothing in the INA to suggest that an individual who might be entitled to a CLN under one provision cannot be entitled to a

CLN under another. The fact that Appellant could have received, or still could receive, a CLN under Section 5 cannot, without more, justify the Department's denial of Appellant's request for a CLN under Section 1 or 2 of the INA.

### Conclusion

The judgment of the District Court is affirmed in part and reversed in part. We remand the case to the District Court with instructions to remand the case to the Department of State to reconsider Appellant's request for a CLN pursuant to Section 1 of the INA in a manner consistent with this opinion.

*So ordered.*

### ADDENDUM

**Nationality (Amendment No. 2) Law, 5728–1968**

• http://www.israellawresourcecenter.org/israellaws/fulltext/nationality680807.htm

**Law of Return (Amendment 5714–1954)**

• http://www.knesset.gov.il/laws/special/eng/return.htm

**U.S. Department of State, 7 Foreign Affairs Manual – Consular Affairs 1250–54 (Last visited May 29, 2012)**

• http://www.state.gov/documents/organization/120544.pdf

WILLIAMS, *Senior Circuit Judge*, concurring: I do not understand us to be finding that decisions of the State Department's Director, Office of Policy Review and Interagency Liaison, Bureau of Consular Affairs, interpreting ambiguous provisions of 8 U.S.C. § 1481(a) in order to decide whether an applicant for a Certificate of Loss of Nationality is entitled to such a certificate, can never qualify for Chevron deference (in academic parlance, the "Chevron Step Zero" issue). It is enough that the explanation offered here does not qualify as reasoned decisionmaking. Thus a remand is essential. See, e.g., *Northern Air Cargo v. U.S. Postal Service*, 674 F.3d 852, 860 (D.C. Cir. 2012) (where the agency has made "no attempt . . . to parse or reconcile the ambiguous statutory language," the "proper course is . . . to remand . . . to gain authoritative and careful interpretations of the disputed provisions").